UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
JAMES THOMAS,

                                             Plaintiff,

         - against -

OFFICER E. JACOBS; SGT. MILLER;
SUPERINTENDENT WILLIAM KEYSER;
NURSE LESCANO; and SGT. MILISAUSKAS,

                                             Defendants.
----------------------------------------------------------x

**OPINION & ORDER**

No. 19-CV-6554 (CS)

<u>Appearances</u>:

James Thomas
Alden, New York
*Pro Se Plaintiff*

Janice Powers
Assistant Attorney General
Office of the Attorney General of the State of New York
White Plains, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

        Before the Court is Defendants' motion for summary judgment.  (ECF No. 58.)  For the

following reasons, the motion is granted.

## I.    **BACKGROUND**

        The following facts are based on Defendants' Local Civil Rule 56.1 Statement and

supporting materials, and are undisputed unless otherwise noted.[1]

---

        [1] Plaintiff did not file a responsive Rule 56.1 Statement.  Local Civil Rule 56.1 requires
that the party opposing a motion for summary judgment submit a counterstatement responding to
the moving party's statement of material facts, indicating which facts are admitted and which the
opposing party contends are in dispute and require a trial.  L.R. 56.1(b).  Under the Local Rule,

A.   **Facts**

Plaintiff is incarcerated in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").  (ECF No. 59 ("Ds' 56.1 Stmt.") ¶¶ 1-2.)  During the events relevant to this lawsuit, Plaintiff was held at Sullivan Correctional Facility in Fallsburg, New York.  (*Id.* ¶ 1; ECF No. 61-11 ("P's Depo.") at 6:12-18.)  Plaintiff brings this lawsuit in

---

"[i]f the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."  *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) (citing L.R. 56.1(c)).  *Pro se* litigants are not excused from this requirement.  *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 344 n.4 (S.D.N.Y. 2011).  Defendants served Plaintiff with the notice required by Local Civil Rule 56.2, although they failed to attach to their notice the full text of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, as required by Local Civil Rule 56.2.  (*See* ECF No. 63.)  Regardless, Plaintiff was put on notice that he was required to submit evidence, in the form of affidavits or other documents, to respond to Defendants' motion, and he failed to do so.  In fact, all he submitted in response to this motion was a one-page "Answer" citing two cases, accusing Defendants of hiding facts, and stating that his evidence – again not submitted in response to the motion – established all material facts in this case.  Accordingly, I have discretion to consider any properly supported facts in Defendants' Local Civil Rule 56.1 Statement admitted.  Indeed, I could have deemed Plaintiff to have abandoned his claims.  *See Wilkov v. Ameriprise Fin. Servs., Inc.*, 753 F. App'x 44, 47 (2d Cir. 2018) (summary order); *Turner v. Sidorowicz*, No. 12-CV-7048, 2016 WL 3938344, at *4 (S.D.N.Y. July 18, 2016) (collecting cases).  (The Court will send Plaintiff copies of any unpublished decisions cited in this Opinion and Order.)  But granting Plaintiff solicitude, I have considered his deposition testimony.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (cleaned up) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.").  Allegations in Plaintiff's Amended Complaint, however, cannot be considered as affirmative evidence in this case because the Amended Complaint (unlike his original Complaint, (ECF No. 1), which I do consider as evidence) was not sworn under penalty of perjury as required under 28 U.S.C. § 1746.  *See Rickett v. Orsino*, No. 10-CV-5152, 2013 WL 1176059, at *2 n.5 (S.D.N.Y. Feb. 20, 2013), *report and recommendation adopted*, 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013); *see also Continental Ins. Co. v. Atl. Cas. Ins. Co.*, No. 07-CV-3635, 2009 WL 1564144, at *1 n. 1 (S.D.N.Y. June 4, 2009) ("On a motion for summary judgment, however, allegations in an unverified complaint cannot be considered as evidence."); *Biller v. Excellus Health Plan, Inc.*, No. 14-CV-0043, 2015 WL 5316129, at *1 (N.D.N.Y. Sept. 11, 2015) ("[A] plaintiff may not use her unverified pleading to support a factual assertion in her motion for summary judgment."); *Zayas v. Caring Cmty. of Conn.*, No. 11-CV-442, 2012 WL 4512760, at *4 (D. Conn. Oct. 1, 2012) (to the same effect).

connection with a search conducted on February 18, 2019 and events thereafter, including a
second search on April 16, 2019.

### 1.    February 18, 2019 Search

On February 16, 2019, relatives visited Plaintiff at Sullivan.  (Ds' 56.1 Stmt. ¶ 6.)
Plaintiff testified at his deposition that during that visit he received drugs from another inmate,
inside several balloons,[2] in exchange for $200 that he gave to his sister to compensate her for
visiting.  (*Id.* ¶ 7; P's Depo. 41:9-42:6.)  He testified that he put some of the balloons in his
rectum and swallowed others.  (P's Depo. at 42:2-6.)  He was searched after the visit and officers
suspected he had contraband because it looked like he had used Vaseline or some similar
substance on his anus.  (Ds' 56.1 Stmt. ¶ 8; P's Depo. at 14:2-13.)  Prison officials placed him in
a dry cell[3] and monitored him one-on-one so they could recover any contraband he had
attempted to smuggle into the prison.  (D's 56.1 Stmt. ¶¶ 8-9; Miller Decl. ¶ 4.)

On February 18, 2019, Plaintiff was still in the dry cell and Defendant Miller, a sergeant
employed by DOCCS, spotted a piece of blue balloon on the floor of the cell during a linen
exchange.  (Ds' 56.1 Stmt. ¶ 10.)  Miller instructed Defendant Jacobs, a correction officer
employed by DOCCS, to pat-frisk Plaintiff, and Jacobs felt something in Plaintiff's pocket.  (*Id.*
¶ 11.)  Jacobs took Plaintiff out of the dry cell and observed Plaintiff "clench[ing]" his buttocks

---

[2] Plaintiff testified at his deposition that he did not know what drugs were inside the
balloons.  (*Id.* 40:16-23.)  The contents of the balloons were later tested and found to be a
synthetic form of marijuana (commonly known as "K2") and Buprenorphine (commonly known
by the brand name "Suboxone"), which is a prescription narcotic commonly used to treat opioid
addiction.  (*See* ECF No. 61-1 at 019-20; Ds' 56.1 Stmt. ¶ 31.)  Both substances are prohibited in
New York State Prisons.  (Ds' 56.1 Stmt. ¶ 33.)

[3] Defendants explain that "[a] dry cell is a cell without water which allows for the
recovery of ingested or inserted contraband by preventing the contraband from being flushed
away in a toilet."  (ECF No. 61-5 ("Miller Decl.") ¶ 4.)

while he was walking. (*Id.* ¶ 12.) Miller similarly states he observed an unusual gait. (*Id.*) At that point, Miller and Jacobs brought Plaintiff to a designated "strip-frisk room" to conduct a strip frisk.[4] (*Id.* ¶ 14.)

Time-stamped surveillance footage from Sullivan's strip-frisk room on February 18, 2019 (the "Sullivan Video")[5] shows the following: Shortly before 10:14 a.m., officers identified by Defendants as Jacobs and Miller, (Ds' 56.1 Stmt. ¶ 4),[6] escorted Plaintiff into the strip-frisk room, (*see* Sullivan Video at 10:13:48). Miller stepped into the hallway twice to summon additional officers (who are not parties to this lawsuit), one of whom stood in the room while the other stood in the doorway as Jacobs removed Plaintiff's handcuffs. (*Id.* at 10:14:12-:20.) Miller exited, the two non-party officers remained, and Plaintiff began undressing. (*Id.* at 10:14:21.)

Plaintiff had been facing the wall in the corner of the room, but once he was fully undressed, he turned to face Jacobs and Jacobs pointed toward the wall, apparently ordering Plaintiff to turn back around. (*Id.* at 10:15:19-:26.) Plaintiff complied but shortly thereafter

---

[4] The term "strip frisk," as used by Defendants, means a search in which the inmate removes his clothes and an officer visually inspects his body cavities, including the anus. *See* DOCCS Directive No. 4910 at 7. Per DOCCS policy, correction officers can perform a strip frisk upon a determination of probable cause and authorization from a sergeant or higher-ranking officer. *Id.* at 8. By contrast, a "body cavity search" under DOCCS policy means physical examination of an individual's "oral and/or genital cavities"; DOCCS policy requires that such a search be performed by a medical professional and authorized by the "Superintendent, Acting Superintendent, or facility Officer of the Day." *Id.* at 10-11.

[5] A copy of the video was submitted to chambers and annexed as Exhibit B to the Declaration of Janice Powers. (ECF No. 61.)

[6] Plaintiff's deposition testimony confirmed the physical description of Jacobs and Miller provided by Defendants. (P's Depo. at 9:15-10:24.)

turned around again and seemingly argued with Jacobs.  (*Id.* at 10:15:29-:36.)[7]  Jacobs pointed

toward the door and the two unnamed officers began to leave, but Plaintiff turned around a third

time, at which point Jacobs grabbed his arm and pushed him against the wall, the two unnamed

officers joined Jacobs to assist in the hold, and Miller and another officer came back into the

room to observe.  (*Id.* at 10:15:40-:50).  Jacobs and Plaintiff exchanged words, and it appears

that Jacobs attempted to move Plaintiff's right arm behind his back in an attempt to cuff him.

(*Id.* at 10:15:52-16:06.)  At that point, Plaintiff seemingly resisted, a struggle ensued, and one of

the non-party officers pulled out and discharged what Defendants state is pepper spray, which

failed to subdue Plaintiff.  (*Id.* at 10:16:07-:12; Ds' 56.1 Stmt. ¶ 24.)  As the struggle began,

Jacobs held Plaintiff's upper body, restraining him.  (Sullivan Video at 10:16:06-:09.)  Jacobs

then bent down near the lower half of Plaintiff's body, and the viewer cannot clearly see what

Jacobs did for three to four seconds because the bodies of Miller and one of the non-party

officers blocked him from the camera's perspective.  (*Id.* at 10:16:09-:13.)  Once Jacobs can be

fully seen again, he was holding Plaintiff's legs as the officers took Plaintiff down to the floor.

(*Id.* at 10:16:13-:14.)  Once Plaintiff was on the ground, Miller dropped down and reached

toward Plaintiff's body.  (*Id.* 10:16:21-:28)[8]  Plaintiff then remained still and the officers finished

cuffing him.  (*Id.* at 10:16:29-:48.)  Once Plaintiff was still and in handcuffs, Jacobs picked up

---

[7] Plaintiff testified at his deposition that he is hard of hearing, and because his hearing aids were taken when he was put in the dry cell, he could not clearly hear Jacobs's commands and was turning around to try to read his lips.  (P's Depo. at 27:16-28:18; 32:20-33:3.)  But the video reflects that Jacobs is issuing commands while Plaintiff is facing him, and Plaintiff is continuing to argue.

[8] Miller stated in his declaration that he "observed a blue colored balloon between the cheeks of [Plaintiff's] buttocks which started to come loose as the Plaintiff resisted and I dropped to the floor quickly in an attempt to grab it, but was unsuccessful."  (Miller Decl. ¶ 11.)

something from the floor, (*id.* at 10:17:04-:10), which Defendants state was a balloon which had

fallen out of Plaintiff's buttocks, (Ds' 56.1 Stmt. ¶ 28).[9]

Plaintiff claims that while he was cuffed and held against the wall, Jacobs "ha[d] his

fingers inside of [Plaintiff's] rectum" in order to dislodge the contraband. (P's Depo. at 29:10-

18.) Jacobs states that he grabbed Plaintiff's legs and never inserted his fingers into Plaintiff's

anus or rectum. (ECF No. 61-4 ("Jacobs Decl.") ¶¶ 13-14.) Miller states that what he observed

is consistent with Jacobs's account. (Miller Decl. ¶¶ 10-11.)

After the search and struggle, Plaintiff remained on the floor and was unresponsive, so

Miller called for medical assistance. (Ds' 56.1 Stmt. ¶ 34.) Defendant Lescano, a registered

nurse employed by DOCCS, (ECF No. 61-6 ("Lescano Decl.") ¶ 1), came to the strip-frisk room

at about 10:25 a.m. and had Plaintiff transported in a wheelchair to the prison medical clinic,

(Ds' 56.1 Stmt. ¶¶ 35, 37).

Plaintiff did not speak to Lescano when he first reached the medical clinic, (P's Depo at

37:11-17), and when Lescano tried to take his temperature orally he refused to open his mouth

and spoke through clenched teeth, (D's 56.1 Stmt. ¶ 39). Lescano spotted what looked like a

balloon in his mouth, and she and a non-party correction officer ordered him to spit it out, which

he did. (Ds' 56.1 Stmt. ¶ 40; P's Depo. at 37:18-22, 39:15-24.) According to Lescano's

contemporaneous records and her affidavit, she asked Plaintiff whether he had any other

contraband or had swallowed anything, and he responded that he had nothing else and had not

swallowed anything. (Ds' 56.1 Stmt. ¶ 40.) According to Plaintiff, when Lescano asked him

whether he had swallowed anything, he said he believed he had, and she responded, "[W]ell,

---

[9] The balloon recovered in the strip-frisk room search was found to contain K2 and
Suboxone, and K2 was also found in the pockets of Plaintiff's pants (which had been removed
prior to the search). (ECF No. 61-1 at 019-20.)

that's on you, you're an asshole, you shouldn't have swallowed something."  (P's Depo. at 38:19-24.)

Lescano flushed the pepper spray from Plaintiff's eyes, did a visual examination of Plaintiff's body, and treated scrapes on his shoulder and knee.  (Ds' 56.1 Stmt. ¶ 41.)  According to Lescano, Plaintiff denied any other injuries, acute distress, or discomfort, and made no further complaints.  (*Id.* ¶¶ 41-42.)[10]  He was then returned to the dry cell where he remained on one-on-one watch.  (*Id.* ¶ 43.)  Lescano checked on Plaintiff at the end of her shift, around 2:00 p.m., and he refused medical attention but stated that he wanted to file a Prison Rape Elimination Act ("PREA") complaint; Lescano reported the latter request to the on-duty sergeant.  (*Id.*)

About four hours later, an unidentified nurse and the prison doctor saw Plaintiff, and he told them that he may have swallowed a balloon containing contraband.  (*Id.* ¶ 44.)  The prison doctor sent Plaintiff to Catskill Regional Medical Center ("CRMC"), an outside hospital.  (*Id.* ¶¶ 44-45.)  Plaintiff's CRMC records[11] reflect that he was admitted for "accidental drug overdose," "drug ingestion," and "swallowed foreign body," and that he told hospital personnel that he had swallowed a cellophane-wrapped balloon containing sixty 12 milligram Suboxone pills at 10:30 that morning.  (*Id.* ¶ 46.)  While at CRMC, Plaintiff defecated and more Suboxone was recovered.  (ECF No. 61-1 at 041-45.)  He was discharged and went back to Sullivan on February 21, 2019.  (Ds' 56.1 Stmt. ¶ 46.)  Plaintiff did not testify to complaining to any hospital

---

[10] In his Amended Complaint, Plaintiff alleged that he told Lescano his anus was hurting and bleeding, (ECF No. 21 ("AC") at 7, 13), but Plaintiff did not testify to that effect.  (Citations to Plaintiff's Amended Complaint refer to the page numbers generated by the court's electronic filing system.)

[11] Plaintiff's CRMC records were submitted to chambers and annexed as Exhibit G to the Declaration of Janice Powers.  (ECF No. 61.)

personnel about pain or bleeding in his anus, nor do his hospital records reflect any such complaint or injury.  (*See generally* P's Depo; ECF No. 61-8.)

Plaintiff testified at his deposition that when he returned to Sullivan he was placed in the special housing unit ("SHU") and unidentified correction officers regularly ensured that he received inadequate portions of meals.  (P's Depo. 49:21-50:19, 54:8-19.)[12]  He also asserted that his mail was delayed.  (*Id.* at 50:19-51:13.)  Plaintiff testified that he believes these actions were retaliatory because at one point, Jacobs escorted him back to his cell and told him that if he did not change his statement regarding the search on February 18, he would "have it rough" in the SHU because Jacobs's "buddies work down there," and that Plaintiff "would starve and nobody would believe anything that [he] say[s]."  (P's Depo. at 55:17-56:3.)  Plaintiff asserts he reported this incident to DOCCS's Office of Special Investigations ("OSI").  (*Id.* at 56:4-17.)[13]

### 2.   April 16, 2019 Search

On April 16, 2019, Defendant Milisauskas, a sergeant with DOCCS, learned from a superior officer that a confidential informant had reported that Plaintiff had illegal drugs.  (Ds' 56.1 Stmt. ¶ 48; ECF No. 61-7 ("Milisauskas Decl.") ¶ 4.)  Milisauskas went to Plaintiff's cell and saw him flushing what looked like tobacco.  (Ds' 56.1 Stmt. ¶ 49; Milisauskas Decl. ¶ 4.)[14] Plaintiff testified that it was tobacco and that he flushed it because he believed it had been planted in his laundry as a "set up" in further retaliation for his complaints about the February 18

---

[12] Plaintiff testified that he and other inmates wrote grievances to the prison about the issues with his food.  (P's Depo. at 50:17-19.)  It is unclear whether his testimony is that other inmates wrote grievances on his behalf or corroborating his treatment, or if other inmates were experiencing the same issue with inadequate portions.  Neither party has submitted the grievances as evidence.

[13] Neither Party has submitted Plaintiff's reports to OSI nor records reflecting OSI's investigation or its resolution, so these documents are not before the Court on this motion.

[14] Tobacco is apparently prohibited in SHU.  *See* DOCCS Directive No. 4933 § 302.2.

search.  (P's Depo. at 58:18-60:12.)  Milisauskas ordered a pat frisk and the non-party officer

who performed the pat frisk felt a hard object near Plaintiff's groin area.  (ECF No. 61-2 at 087;

Ds' 56.1 Stmt. ¶¶ 51, 53.)  Plaintiff was taken to the strip-frisk room, where he stripped, and

(according to defendants) admitted to having marijuana, which he removed from his buttocks

and placed on the floor.  (Ds' 56.1 Stmt. ¶ 56.)  Plaintiff contests this account, stating that he had

no drugs and could not have had drugs because he had not been out of his cell in SHU since

returning from the hospital in February.  (P's Depo. at 61:24-62:12.)  He asserts that the officers

planted the marijuana they claimed to recover from him in the strip-frisk room.  (P's Depo. at

61:17-22.)[15]

A few hours later, Plaintiff went to the prison medical clinic, claimed to have swallowed

synthetic marijuana and Suboxone, and was immediately sent to CRMC.  (Ds' 56.1 Stmt. ¶ 61.)

Plaintiff states that he had lied about swallowing contraband in order to get out of the prison

where he was being retaliated against and starved.  (P's Depo. at 62:13-63:4.)  Plaintiff stayed at

CRMC until April 19 and then was sent back to Sullivan; no contraband was recovered during

this hospital stay.  (Ds' 56.1 Stmt. ¶ 61.)

Plaintiff alleged for the first time in his Amended Complaint (but did not testify at his

deposition) that on April 17 or 18, while he was at CRMC, Jacobs came into his room, choked

---

[15] Plaintiff states he was later given a "ticket" charging him with marijuana possession.
(P's Depo. at 64:3-5.)  He states he watched a video of that search with the hearing officer, and
he was "showing her everything and all that and she's just thinking in her head, like, this is a
damn shame."  (P's Depo. at 64:11-17.)  This video was not submitted as evidence and according
to Milisauskas's interrogatory answers (provided in a letter submitted by Defendants to the
Court), no such video exists.  (See ECF No. 73 at 5.)  Plaintiff further testified that the hearing
on the marijuana charge was adjourned, he was never called back, and the charge was "outright
dismissed."  (*Id.* at 64:18-65:2.)  By contrast, Milisauskas states in his declaration that Plaintiff
was found guilty of the charge at a disciplinary hearing.  (Milisauskas Decl. ¶ 7.)  Neither party
has submitted Plaintiff's prison disciplinary records.

him, and threatened him with worse if he did not change his statement regarding the February 18

search.  (AC at 8-9.)  A logbook from the hospital watch of Plaintiff does not reflect that Jacobs

saw Plaintiff at CRMC hospital.  (Ds' 56.1 Stmt. ¶ 63.)[16]

### B.    Procedural History

Plaintiff filed this lawsuit on July 12, 2019 against Correction Officer Earl Jacobs,

Sergeant Ronald Miller, and Superintendent William Keyser.  (ECF No. 1.)  On September 13,

2019 this case was reassigned from Chief Judge Colleen McMahon to me.  On the same date I

denied without prejudice Plaintiff's motion to have counsel appointed, explaining that it was too

early in the case for me to assess the application as required under *Cooper v. A. Sargenti Co.*, 877

F.2d 170, 172 (2d Cir. 1989), and ordered the Clerk to deliver to the United States Marshals

Service all documents necessary to effect service.  (ECF No. 8.)  On December 13, 2019,

Defendants filed a pre-motion letter in contemplation of a motion to dismiss.  (ECF No. 14.)  On

January 16, 2020, I held a pre-motion conference at which I granted leave for Plaintiff to amend

his complaint.  (*See* Minute Entry dated Jan. 16, 2020.)  On January 22, 2020, Plaintiff again

moved for appointment of counsel, (ECF No. 19), and I again denied the motion without

prejudice, explaining that civil litigants do not have a right to counsel, and that I might be able to

seek volunteer counsel for Plaintiff later in the case if the case appeared likely to have merit,

(ECF No. 20).  Plaintiff filed the Amended Complaint on January 27, 2020, adding as defendants

---

[16] Defendants have provided videos that they assert are surveillance footage of the area
outside of Plaintiff's hospital room at CRMC on April 18, 2019, annexed as Exhibit I to the
Declaration of Janice Powers.  (ECF No. 61.)  The videos are eleven short clips, all between
approximately thirty seconds and five minutes in length, which show corrections officers in the
hallway in a hospital.  The person identified by Defendants as Jacobs in the prison surveillance
footage from February 18, 2019 does not appear in the clips from CRMC.

Constance Lescano, R.N., Sergeant Stephen Milisauskas, and five unnamed "John Doe" correction officers.  (AC.)

On May 11, 2020, Defendants answered the Amended Complaint, (ECF No. 42), and on May 28, 2020 the Court entered a discovery plan and scheduling order, (ECF No. 45).  The Court granted two extensions to the discovery schedule, the first based on Plaintiff's representation that he had not received certain discovery and had been given inadequate time to review OSI's files with regard to his claims, (*see* Minute Entry dated Dec. 17, 2020), and the second in order to give Defendants time to respond to interrogatories propounded by Plaintiff that Defendants' counsel had just received, (ECF Nos. 56-57).

On April 29, 2021, Defendants filed the instant motion.  (ECF No. 58.)  By application dated May 2, 2021, Plaintiff again requested that the Court appoint him counsel, (ECF No. 67), and on May 7, 2021 the Court denied the request, (ECF No. 68).  On May 27, 2021, Plaintiff filed a one-page opposition to Defendants' summary judgment motion, which cited no evidence and was not accompanied by a Local Civil Rule 56.1 statement, affidavits, or any other records of any kind.  (ECF No. 69.)  Defendants filed a reply in further support of their motion on June 30, 2021.  (ECF No. 70.)

By letter dated November 17, 2021, Plaintiff asserted that Defendants had never responded to his interrogatories and that he was required to respond Defendants' motion without the benefit of that discovery; that he viewed video footage from the hospital and believes it had been tampered with; and that he had been unable to view the prison video from the February 18, 2019 incident.  (ECF No. 71.)  Defendants responded on December 3, 2021, detailing a list of documents that were provided to Plaintiff pursuant to Local Civil Rule 33.2 (including interrogatory responses); explaining that Plaintiff had viewed the February 18, 2019 video at

least four times; detailing additional documents turned over to Plaintiff in discovery; setting out again responses to Plaintiff's additional interrogatories; and stating that videos provided to Plaintiff were sent in the form in which they were received.  (ECF No. 72.)  That letter satisfied the Court that Defendants had complied with their discovery obligations, and Plaintiff was given three weeks to submit new or additional arguments based on the interrogatory responses he claimed to have never received.  (ECF No. 73.)  By letter dated December 22, 2021, Plaintiff stated that he just received paperwork from the Attorney General's office because it was sent to the wrong facility.  (ECF No. 74.)[17]  By letter dated January 3, 2022, Plaintiff sent an excerpt of DOCCS Directive No. 4910, as well as a New York State Freedom of Information Law response from DOCCS dated May 8, 2019.  (ECF No. 75.)

## II.     **LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

---

[17] It is not completely clear to what paperwork Plaintiff was referring, as he mentioned paperwork mailed on December 6, 2021.  But because Plaintiff mentioned the substance of one of the interrogatory responses that are included in Defendants' December 3, 2021 letter to the court, (ECF No. 72), the Court assumes he was referring to that letter.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). If "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

13

*Pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).  Where, as here, the non-moving party fails to meaningfully respond to the movant's summary judgment motion, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (cleaned up).  "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Id.* (cleaned up) (emphasis omitted).

## III.   **DISCUSSION**

The Court construes Plaintiff's submissions "liberally" and "interpret[s] them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Plaintiff advances claims against Jacobs under the Fourth and Eighth Amendment, against Miller and Lescano under the Eighth Amendment, and against Lescano under the Equal Protection Clause of the Fourteenth Amendment.  He also asserts retaliation claims against Milisauskas, Jacobs, and several "John Doe" officers, and a failure-to-protect claim against Keyser.[18]

---

[18] Plaintiff's Amended Complaint also states Fourteenth Amendment claims against Jacobs, Miller, Keyser, and Milisauskas, but the theory of those claims is not clear to the Court, and they are based on the same allegations as the other claims.  To the extent Plaintiff intended an Equal Protection claim, it would fail for the reasons set forth below in connection with the Equal Protection claim against Defendant Lescano.  To the extent he intended failure-to-intervene claims against any Defendant, those claims are addressed herein.

A.      **Fourth Amendment Claim**

Plaintiff asserts a Fourth Amendment claim against Jacobs regarding the February 18, 2019 search.  While "a prisoner's rights to be free from unreasonable searches is diminished once he or she steps through the prison door," *Harris v. Keane*, 962 F. Supp. 397, 407 (S.D.N.Y. 1997), "inmates do retain a limited right to bodily privacy" under the Fourth Amendment, *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (cleaned up).  "First, the court must determine whether the inmate has exhibited an actual, subjective expectation of bodily privacy." *Id.* (cleaned up). Such expectation must be one that "society would consider . . . reasonable." *Forde v. Zickefoose*, 612 F. Supp. 2d 171, 182 (D. Conn. 2009); *see White v. Doe*, No. 16-CV-1874, 2021 WL 4034164, at *4 (D. Conn. Sept. 3, 2021).  While any subjective expectation by Plaintiff that he would not be subject to a strip frisk and visual cavity inspection may not have been reasonable – considering that he attempted to smuggle contraband by swallowing it and hiding it in his body cavity, and knew he was suspected of the same – it is a closer question whether it is reasonable to assume that no one would manually dislodge that contraband if it were found.  But even if it were not reasonable for Plaintiff to assume as a general matter that no one would manually dislodge the contraband, I will assume that he had a reasonable subjective expectation that the manual removal would not occur in the sudden manner and with the force he describes. *See Harris*, 818 F.3d at 57.

Because Plaintiff had at least some reasonable subjective expectation of privacy, the Court must assess the official's justification for the challenged search. *Harris*, 818 F.3d at 57. Where, as here, "the inmate's claim challenges an isolated search, rather than a regulation or policy, courts typically apply the standard set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979)" to assess the reasonableness of the search. *Torres v. City of N.Y.*, No. 17-CV-6604, 2019 WL

7602181, at *10 (S.D.N.Y. Aug. 14, 2019) (cleaned up), *report and recommendation adopted*, 2019 WL 4784756 (S.D.N.Y. Sept. 30, 2019).  The *Bell* test looks to (1) "the scope of the particular intrusion," (2) "the manner in which it is conducted," (3) "the justification for initiating it, and" (4) "the place in which it is conducted."  *Bell*, 441 U.S. at 559.  The Court analyzes each of these factors in turn.

### 1.    Scope of Intrusion

"[T]he scope of the intrusion . . . varies with the type of search."  *Harris*, 818 F.3d at 58. The Second Circuit has explained:

> There are at least three types of searches that implicate an inmate's right to bodily privacy:
>
> A "strip search," though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities.  A "visual body cavity search" extends to visual inspection of the anal and genital areas.  A "manual body cavity search" includes some degree of touching or probing of body cavities.

*Id.* (cleaned up).  Whether the officer performing the search is "of the same gender as the inmate" – as was the case here – is also relevant to the scope of intrusion.  *See id.*

The parties disagree whether the search here, which started as a visual body cavity search (although that search never really took place), escalated into a manual body cavity search. Defendants assert that contraband came loose and fell out as the officers held Plaintiff to the floor, but Plaintiff asserts that Jacobs inserted his finger into his anus to dislodge the contraband. Jacobs and Miller both state that Jacobs did not insert his fingers into Plaintiff's anus or rectum.

Video of the search does not completely rule out the possibility that Jacobs used some form of physical contact or force to dislodge the contraband.  While at no point is Jacobs seen to insert his finger into Plaintiff's anus, for three to four seconds Jacobs is partially out of view. Based on his actions just before and just after that short period, it appears he is simply struggling

with Plaintiff and attempting to secure his legs; as he comes back into view he is holding Plaintiff's legs, taking him down to the floor.  Those three to four seconds are in all likelihood not enough time for Jacobs to have searched Plaintiff the way Plaintiff claims.  Nevertheless, because the video does not unambiguously show that Jacobs applied no force to dislodge the contraband from Plaintiff's buttocks, I cannot foreclose the possibility that a jury could credit Plaintiff's testimony and find that there was at least some contact.  A manual body cavity search is not "*per se* unreasonable," but "the highly intrusive nature of the search, even if conducted by male correction officers, weighs in favor of a finding that the search was unreasonable." *Torres*, 2019 WL 7602181, at *12.  Given that a jury could find that at least a partial manual search was used to obtain the contraband here, this factor weighs in favor of finding the search unreasonable.

### 2.      Manner in Which the Search Was Conducted

A search conducted in a professional manner is more likely to be reasonable than one that is not.  *Harris*, 818 F.3d at 59-60.  Here, the search began in a professional manner, but devolved when Plaintiff turned around multiple times.  Video of the event produced by Defendants includes no sound, so the exact nature of the argument cannot be heard.  The video shows that Jacobs was issuing commands (while Plaintiff is looking at him) and Plaintiff turned around three times to argue with Jacobs.  Jacobs eventually pins Plaintiff to the wall, and two additional officers restrain Plaintiff.  Plaintiff attempted to either jerk free of or resist Jacobs's grip, and is then taken to the floor and handcuffed.  At some point the contraband comes free (as discussed, potentially after being manually dislodged by Jacobs).

In *Torres*, it was undisputed "that, in order for the Officer Defendants to recover the contraband, they not only restrained Plaintiff, but forced him to the ground, held him down,

spread his legs, and forcibly removed the contraband from inside his body." 2019 WL 7602181, at *12. On those facts, the court found that "[t]he Officer Defendants have offered no legitimate penological justification for recovering the observed contraband in this manner, when alternatives were likely available to recover it without the use of force" – including placing the plaintiff in a dry cell or allowing medical personnel to perform the search. *Id.* Accordingly, the court found that the degree of force used appeared to be unreasonable. *Id.*

Here, it is disputed whether any force was used to dislodge the contraband, but the Court must assume for purposes of the motion that it was. One of the alternatives mentioned by the *Torres* court – sending Plaintiff back to the dry cell – does not seem to have been feasible here, as the presence of the balloon fragment in the dry cell suggests that Plaintiff had, despite his placement there, succeeded in secreting and perhaps consuming the contents of a balloon. But the other option – taking him to the medical unit – was available here. Moreover, DOCCS procedures called for medical personnel to perform any manual search. (*See* note 4 above.) That fact alone does not make the search *per se* unconstitutional, *see, e.g.*, *Jenkins v. City of N.Y.*, No. 18-CV-7024, 2020 WL 6700087, at *3 (E.D.N.Y. Nov. 12, 2020) (violation of DOCCS policy "does not, in and of itself, constitute a cognizable constitutional claim"), but it is relevant to the reasonableness of the manner of the search, *see Torres*, 2019 WL 7602181, at *12 n.8. But any use of force used to dislodge the contraband here occurred before Plaintiff was fully restrained, and given that the officers did not know what contraband Plaintiff possessed, the security risk was unknown. Accordingly, this factor weighs only moderately against finding that the search was reasonable.

### 3.     The Justification for Initiating the Search

This factor calls on the Court to assess the record evidence supporting the officials' justification for the search, *Harris*, 818 F.3d at 60, setting aside the manner in which the search was conducted, *Torres*, 2019 WL 7602181, at *13. Here the record fully justifies the search. Plaintiff was in a dry cell because of reasonable suspicion that he was attempting to bring in contraband. Miller saw a piece of balloon, leading him to further suspect the presence of contraband, and that suspicion was further bolstered when both Miller and Jacobs observed Plaintiff walking as though he had something hidden in his buttocks. Plaintiff verbally and then physically resisted a visual search. Even without the resistance, there was ample cause to believe Plaintiff was secreting contraband and thus that it had to be removed. The resistance only solidified that need. Accordingly, this factor weighs in favor of reasonableness.

### 4.     Place in Which the Search Was Conducted

"[A] strip search or a body cavity search conducted in the presence of unnecessary spectators is less reasonable than one conducted in the presence of only those individuals needed to conduct the search." *Harris*, 818 F.3d at 62. The search here was conducted in a private strip-frisk room. The video reflects that during the search, prior to the struggle, between one and three additional officers were present in the room or observing from the doorway. Given security concerns this does not strike the Court as excessive or unnecessary, and weighs in favor of reasonableness.

### 5.     Qualified Immunity

In light of the above, it is a close question whether this search was reasonable and thus in line with the Fourth Amendment. But the Court need not resolve that question decisively, or

leave it a jury to determine, because, to the extent the search was unreasonable, Jacobs is entitled to qualified immunity on Plaintiff's Fourth Amendment claim.

"A defendant is entitled to qualified immunity if (1) the defendant's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for the defendant to believe that his actions were lawful at the time of the challenged act." *Brandon v. Kinter*, 938 F.3d 21, 39 (2d Cir. 2019) (cleaned up). "'Clearly established law' should not be defined 'at a high level of generality'" and while the court does not need to identify a case "directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "[Q]ualified immunity 'protects all but the plainly incompetent or those who *knowingly* violate the law.'" *Berg v. Kelly*, 897 F.3d 99, 109 (2d Cir. 2018) (emphasis in original) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).

The *Torres* court found that officers were entitled to qualified immunity on facts similar to those presented here:

> Plaintiff has not pointed to, and this Court is not aware of, any case law providing that correction officers who have a legitimate penological justification for conducting a body-cavity search of an inmate for suspected contraband, and who conduct such a search in a private setting and with officers of the same gender as the inmate, are then constitutionally prohibited from using force to remove an object observed to be protruding from the inmate's anus. Even if this Court were to conclude that this constituted a violation, this Court is persuaded that it was "objectively reasonable" for the Officer Defendants to believe that their actions in recovering the contraband were lawful, such that they are entitled to qualified immunity from any civil liability.

2019 WL 7602181, at *14 (cleaned up).

I am persuaded by the analysis in *Torres*. *Torres* was decided in 2019, and I am not aware of any precedent that court did not cite, or any case decided since, that decisively address

this issue. It thus remains the case that a reasonable officer in Jacobs's position, with strong

reason to believe contraband was in Plaintiff's anus, could have believed his alleged action to be

lawful.[19] Accordingly, Defendants' motion for summary judgment on the Fourth Amendment

claim is granted.

      **B.**      <u>**Eighth Amendment Excessive Force and Sexual Assault Claims**</u>

Plaintiff advances an Eighth Amendment claim against Jacobs. Read to raise the

strongest arguments it suggests, the Amended Complaint states both an excessive force claim for

the search and alleged penetration, and a sexual abuse claim under the Eighth Amendment. I

address each in turn.

      **1.**      **Excessive Force**

An Eighth Amendment claim generally requires a subjective and objective showing. *See*

*Harris*, 818 F.3d at 63.

> The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct. For excessive force claims, as contrasted with other actions or inactions that rise to the level of Eighth Amendment violations, the test for wantonness is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.
>
> To determine whether defendants acted maliciously or wantonly, a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably

---

[19] To the extent Plaintiff intended to advance a claim of failure to intervene against any other official, such a claim would be dismissed. Assuming Jacobs digitally penetrated Plaintiff for a few seconds, there is no way anybody else had a reasonable opportunity to intervene, *see Ekukpe v. Santiago*, 823 F. App'x 25, 32 (2d Cir. 2020) (summary order) (no liability for failure to intervene unless the officer "had a realistic opportunity to intervene to prevent the harm from occurring") (cleaned up), and in any event any such official would be entitled to qualified immunity for the same reasons as Jacobs.

perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

Accordingly, determining whether officers used *excessive* force necessarily turns on the need for the force used.

*Id.* (cleaned up).

Second, the objective inquiry looks to whether "the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions," an inquiry that is "context specific" and turns on "contemporary standards of decency." *Harris*, 818 F.3d at 64 (cleaned up). "[W]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Id.* The objective element "is satisfied in the excessive force context even if the victim does not suffer serious, or significant injury, as long as the amount of force used is not *de minimis*." *Id.* But "the extent of injury suffered is relevant to the Eighth Amendment inquiry insofar as it indicates the amount of force applied." *Rodriguez v. City of N.Y.*, 802 F. Supp. 2d 477, 481 (S.D.N.Y. 2011).

Applying these principles, a reasonable jury could not conclude that the force here was sufficiently excessive to violate the Eighth Amendment. Even crediting Plaintiff's version of events, this search was not objectively harmful enough to violate the Eighth Amendment. Plaintiff's medical records indicate that his injuries after the search were minor – it is undisputed that he was treated only for pepper spray in his eyes and scrapes on his shoulder and knee. As I discuss in greater detail below, there is no evidence that he told Lescano or any hospital personnel at CRMC about any injury to his anus.

In *Torres*, the court found that plaintiff did not satisfy the objective prong of the Eighth Amendment analysis, even though officers indisputably held the plaintiff down and removed contraband from his anus, and two days later medical personnel assessed the plaintiff as having a "small pinkish mass outside his anus," which the court there characterized as *de minimis*. 2019

WL 7602181, at *8.  Here, there no evidence in the record of any injury to that part of Plaintiff's

body.  The condition for which he was hospitalized was unrelated to any action taken during the

search by Jacobs or any other officer.  Even if there was some temporary rectal bleeding, that is

not surprising when a foreign object has passed through, and would not suffice under the Eighth

Amendment.  *See Torres*, 2019 WL 7602181, *8 (in Eighth Amendment analysis "modest

bleeding is generally insufficient to demonstrate the necessary severity" to satisfy objective

prong).   Accordingly, the Court must conclude that the force used here was *de minimis* and

simply not objectively harmful enough to reach constitutional dimensions.

Even if it were, there is no indication that the Jacobs's purpose was to maliciously and

sadistically cause harm, as opposed to retrieve what he reasonably believed was contraband the

discovery of which Plaintiff was resisting.  Any injury was minimal; Jacobs did not gratuitously

punch or kick Plaintiff, but rather (assuming Plaintiff's version to be true) went after the

contraband; Plaintiff plainly was trying to forestall the recovery of the item; and once it was

obtained the use of force ceased.  A reasonable jury could not find that Jacobs's motive in

searching for the then-unknown contraband was not to find it, but rather to gratuitously harm

Plaintiff.

### 2.    Alleged Sexual Assault

Plaintiff also asserts that the search constituted a sexual assault in violation of the Eighth

Amendment.  With regard to such claims in this context, the Second Circuit has explained:

> To be sure, prison officials looking for contraband may subject inmates to
> reasonable strip searches and cavity searches.  Indeed prison security and safety
> may require frequent searches of an intensely personal nature – and not every
> such search is properly the subject of a lawsuit.  Searches that do not uncover
> contraband may be no less penologically justified than those that do.  And even an
> officer who is meticulous in conducting a search does not violate an inmate's
> constitutional rights as long as the officer had no intention of humiliating the
> inmate or deriving sexual arousal or gratification from the contact.  But a search

> may not be undertaken maliciously or for the purposes of sexually abusing an inmate.

*Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015) (cleaned up).  There is simply no evidence in the record from which a reasonably jury could conclude that this search was undertaken for purposes of humiliation or sexual gratification.  For the reasons already discussed, initiation of the search was justifiable, and it was limited to the area where contraband was reasonably expected to be.  Even accepting Plaintiff's version of events that he was digitally penetrated, the video reflects that this contact could not possibly have been more than momentary.

Accordingly, Defendants' motion is granted as to the Eighth Amendment claims against Jacobs.  To the extent Plaintiff brings failure-to-intervene or supervisory claims in connection with this search against Miller or Lescano, such claims cannot be sustained where there is no underlying constitutional violation, and, as noted, there would have been no opportunity to intervene in any event.  (*See* note 19 above.)  Thus, all such claims are also dismissed.

C.  **Eighth and Fourteenth Amendment Claims Against Lescano**

1.  **Eighth Amendment Deliberate Indifference**

Based on Plaintiff's allegations and deposition testimony, the most plausible claim against Lescano is a medical indifference claim under the Eighth Amendment, which is how Defendants interpret the claim in their memorandum of law.  (ECF No. 60 ("Ds' Mem.") at 17-18.)

The Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  "Yet not every lapse in medical care is a constitutional wrong.  Rather, a prison official violates the Eighth Amendment only when two requirements" – one objective and one subjective – "are met." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (cleaned up).

First, the prisoner must prove, objectively, that he was "actually deprived of adequate medical care[,] . . . [as] the prison official's duty is only to provide reasonable care," *id.* at 279 (citing *Farmer*, 511 U.S. at 844-47), and "that the alleged deprivation of medical treatment [wa]s . . . 'sufficiently serious' – that is, the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain,'" *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)); *see Williams v. Raimo*, No. 10-CV-245, 2011 WL 6026115, at *3 (N.D.N.Y. July 22, 2011) ("no distinct litmus test" for determining whether medical condition is "serious," but court may look at non-exhaustive list of factors, including whether (1) impairment is one that reasonable doctor would find important and worthy to treat, (2) condition affects individual's daily life, and (3) prisoner suffers from chronic and substantial pain).

Where a plaintiff's medical indifference allegations amount to a delay in treatment, "it is appropriate to focus on the challenged *delay* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." *Ray v. Zamilus*, No. 13-CV-2201, 2017 WL 4329722, at *9 (S.D.N.Y. Sept. 27, 2017) (emphasis in original) (cleaned up). On the one hand, "[a] defendant's delay in treating an ordinarily insignificant medical condition can become a constitutional violation if the condition worsens and creates a substantial risk of injury." *Id.* (cleaned up). But on the other, "delay in treating a life-threatening condition may not violate the Eighth Amendment if the lapse does not cause any further harm beyond that which would occur even with complete medical attention." *Id.* (cleaned up); *see Pabon v. Wright*, No. 99-CV-2196, 2004 WL 628784, at *8 (S.D.N.Y. Mar. 29, 2004) ("A delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces a

conscious disregard of a substantial risk of serious harm . . . .  The Second Circuit has reserved

such a classification for cases in which, for example, officials deliberately delayed medical care

as a form of punishment, ignored a life threatening and fast-degenerating condition for three

days, or delayed major surgery for over two years.") (cleaned up).

Second, the prisoner must prove, subjectively, that the charged official acted with a

sufficiently culpable state of mind.  *Salahuddin*, 467 F.3d at 280-81; *see Farmer*, 511 U.S. at 835

("[D]eliberate indifference entails something more than mere negligence . . . [but] it is satisfied

by something less than acts or omissions for the very purpose of causing harm or with

knowledge that harm will result.").  The inmate must prove that the charged official knew of and

disregarded "'an excessive risk to inmate health or safety; the official must [have] both be[en]

aware of facts from which the inference could be drawn that a substantial risk of serious harm

exist[ed], and . . . must also [have] draw[n] the inference.'"  *Johnson*, 412 F.3d at 403 (quoting

*Farmer*, 511 U.S. at 837); *see Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) (*per

curiam*) (equating "deliberate indifference" with criminal "recklessness").

"It is well-established that [neither] mere disagreement over the proper treatment,"

*Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998), nor "[m]edical malpractice . . . become

a constitutional violation merely because the victim is a prisoner," *Estelle v. Gamble*, 429 U.S.

97, 106 (1976).  Rather, to state an Eighth Amendment deliberate indifference claim, an inmate

"must demonstrate that the defendants acted or failed to act while actually aware of a substantial

risk that serious inmate harm would result."  *Farid v. Ellen*, 593 F.3d 233, 248 (2d Cir. 2010)

(cleaned up).  "[P]rison officials . . . may be found free from liability if they responded

reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844.

Plaintiff's claim against Lescano has changed since he filed the Amended Complaint.  In his Amended Complaint, Plaintiff alleged that he told Lescano, in the wake of the search on February 18, 2019, "that his anus was hurting" and "bleeding" and she responded that "nothing should have been up there."  (AC at 7, 13.)  But when questioned about his interactions with Lescano at his deposition, Plaintiff did not mention any exchange regarding pain or bleeding in his anus; rather, he testified that he told Lescano that he may have swallowed a balloon full of contraband, and that Lescano did nothing in response.  (P's Depo. at 38:19-24.)  This latter allegation was not in the Amended Complaint or the original Complaint.

Regardless, there is no evidence in the record that would support a jury verdict for Plaintiff on either of these allegations.  First, with regard to the unsworn allegations in Plaintiff's Amended Complaint, Lescano states that "[a]t no point did the plaintiff state he had a bleeding anus or did I observe any blood from his rectal area or bleeding anywhere in the clinic." (Lescano Decl. ¶ 5.)  Contemporaneous notes by Lescano in Plaintiff's Ambulatory Health Record ("AHR") corroborate her account:  nothing in her notes about his initial visit reflect any statements about pain in that area; it was only on checking in with Plaintiff at the end of her shift, around 2:00 p.m., that Plaintiff apparently mentioned something about wanting to make a PREA complaint.  (ECF No. 61-9 at 001.)  Lescano noted that Plaintiff had not discussed any PREA-related incident or event with her.  (*Id.*)  Further, Plaintiff's medical records from CRMC (where he was sent only hours later) reflect nothing regarding any complaint about or treatment of an injury in that part of his body.  In short, there is no evidence that Plaintiff ever told Lescano about this alleged injury, and thus it is undisputed at this stage that he did not.  Moreover, even if the account in Plaintiff's Amended Complaint could be credited, he does not describe an injury that would be objectively sufficiently serious to trigger a medical indifference claim.  *See Young*

*v. Choinski*, 15 F. Supp. 3d 172, 183-84 (D. Conn. 2014) (collecting cases for the proposition that abrasions with minor bleeding do not constitute a "serious medical need").

Second, Plaintiff's testimony that he told Lescano he may have swallowed a balloon with unknown contraband similarly does not constitute an objectively serious medical condition. While Plaintiff testified that he felt nauseous at some point after he saw Lescano, he did not testify to reporting any such symptoms to Lescano.  (P's Depo. at 45:9-19.)  Once at CMRC, Plaintiff was given activated charcoal, and hospital personnel waited for him to defecate.  (*See* ECF No. 61-8 at 18.)  There is no evidence that the few hours' delay worsened his condition severely (or at all), or caused any additional medical complications.  Accordingly, even though a balloon may burst and lead to a serious and potentially life-threatening medical condition, Lescano's actions (as reported by Plaintiff) clearly did not "cause any further harm beyond that which would occur even with complete medical attention," *Ray*, 2017 WL 4329722, at *9 (cleaned up), and accordingly do not satisfy the objective prong of the deliberate indifference analysis.

Nor do Lescano's alleged actions bespeak deliberate indifference sufficient to give rise to a constitutional claim.  The AHR reflects that Lescano called the prison doctor, informed him of the incident, and sent Plaintiff back to the dry cell for one-on-one monitoring.  (ECF No. 61-9 at 001.)  Beyond informing the prison doctor of the situation, she also checked up on Plaintiff within a few hours of her initial exam before her shift was over, and he refused medical treatment at that time.  (*Id.*)

Accordingly, even crediting the late-raised allegation by Plaintiff that he told Lescano in his initial exam that he thought he had swallowed something, the record does not support the conclusion that Lescano was deliberately indifferent.  Lescano returned Plaintiff to the dry cell

where Plaintiff would be under constant one-on-one observation.  She also followed up on her earlier exam by checking in on him at the end of her shift, at which point he did not report feeling in ill health.  While the doctor and nurse who examined Plaintiff later in the evening saw fit to send him out to the hospital, this amounts to "disagreement over the proper treatment," or – at most – negligence on Lescano's part, neither of which are constitutionally cognizable.  *See Chance*, 143 F.3d at 703; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

Thus, the Eighth Amendment claim against Lescano fails.

### 2.    Fourteenth Amendment Equal Protection Claim

In the Amended Complaint, Plaintiff characterizes the claim against Defendant Lescano as arising under Fourteenth Amendment's Equal Protection clause.  In general, to establish an Equal Protection claim, a plaintiff must show (1) "adverse treatment . . . compared with similarly situated individuals," and (2) "that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *Miner v. Clinton County*, 541 F.3d 464, 474 (2d Cir. 2008) (cleaned up); *see Marom v. Town of Greenburgh*, No. 13-CV-4733, 2015 WL 783378, at *9 (S.D.N.Y. Feb. 23, 2015).  Nothing in the record or in Plaintiff's testimony establishes that he was treated differently by Lescano as compared to any other similarly situated inmate, much less that any differential treatment was based on an impermissible consideration or bad faith intent to injure him.

As such, Defendants' motion for summary judgment on the claims against Lescano is granted.

### D.   **Retaliation Claims**

Plaintiff alleges retaliatory conduct by Defendants Milisauskas, Jacobs, and several unnamed "John Doe" defendants, and a failure-to-protect claim against Keyser related to others' retaliatory conduct.

### 1.   **Milisauskas**

Plaintiff's claims against Milisauskas amount to a claim that Milisauskas planted drugs on Plaintiff (or oversaw another officer who was doing so) in retaliation for his complaint against Jacobs.

The Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (cleaned up); *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike.") (cleaned up); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (skepticism warranted by "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated").

"To establish a First Amendment retaliation claim, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019). But "[t]he defendant may

nonetheless avoid liability by showing that he or she would have taken the adverse action even in the absence of the protected conduct." *Id.* (cleaned up).

First, the law is clear that by filing complaints against correction officers, Plaintiff was engaged in protected activity. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[Plaintiff] has sufficiently alleged . . . participation in protected activity:  the use of the prison grievance system . . . ."); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ("[I]ntentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (cleaned up)); *Morgan v. Dzurenda*, No. 14-CV-966, 2017 WL 1217092, at *12 (D. Conn. Mar. 31, 2017) ("The filing of grievances is a constitutionally protected activity . . . .") (cleaned up); *Pledger v. Hudson*, No. 99-CV-2167, 2005 WL 736228, at *4 (S.D.N.Y. Mar. 31, 2005) ("A prisoner's filing of an internal prison complaint against an officer is protected by the First Amendment . . . ."). Thus, Plaintiff has satisfied the first element of his retaliation claim.

The Second Circuit "define[s] adverse action *objectively*, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill*, 389 F.3d at 381 (cleaned up). If the retaliatory conduct does not rise to that level, "the retaliatory act is simply *de minimis*, and therefore outside the ambit of constitutional protection." *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (internal quotation marks omitted).  "[T]he planting of evidence and issuance of a false misbehavior report based upon that evidence has been found to constitute adverse action for purposes of a retaliation claim." *Henson v. Gagnon*, No. 13-CV-590, 2015 WL 9809874, at *10 (N.D.N.Y. Dec. 10, 2015) (collecting cases), *report and recommendation adopted*, 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016).  Further, courts have concluded that non-routine strip searches, for

which an inmate is singled out, "could deter a typical prisoner from exercising his or her First Amendment rights" and thus constitute an adverse action for purposes of the retaliation analysis. *Johnson v. Naqvi*, No. 18-CV-694, 2021 WL 1723773, at *8-9 (D. Conn. Apr. 29, 2021).

Thus, Plaintiff identifies two potentially adverse actions involving Milisauskas:  the April 16, 2019 strip search itself, which Milisauskas allegedly authorized, and the subsequent allegedly false misbehavior report based on the recovery of drugs, which he claims were planted on him by Milisauskas or one of the other officers in the room during the strip search.  The parties dispute whether the search was pretextual, and whether the drugs were planted.  Given that dispute, there is a question of fact whether an adverse action occurred.

Circumstantial evidence may demonstrate the necessary causal connection between a plaintiff's protected speech and an official's adverse action.  Courts look to the "temporal proximity between an inmate's grievance and alleged retaliation"; "[p]roof of prior good behavior by the inmate"; and "vindication in a disciplinary proceeding arising from the alleged retaliation," *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 240 (S.D.N.Y. 2005), as well as knowledge by the alleged retaliator of the incident that is the subject of the grievance or complaint, *see Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (finding sufficient circumstantial evidence that officer who was alleged to engage in retaliation knew of inmate's suit against other officers).  Temporal proximity alone is insufficient to establish the requisite causal connection.  *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (summary order) ("Although we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim.") (citing *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003)).

With regard to temporal proximity, the Second Circuit has eschewed bright line tests in favor of a context-specific analysis. *Espinal*, 558 F.3d at 129.  Here, the alleged wrongful search occurred nearly two months after Plaintiff initiated the complaint process against Jacobs for the February 18 search.  While Plaintiff asserts that he was still subject to ongoing retaliation from unnamed officials in the form of being given insufficient meals, and it is apparent that the OSI investigation initiated by Plaintiff's complaints was ongoing for at least some period beyond the initial February 18, 2019 search, the record is otherwise silent as to why this alleged retaliation would have come two months later.  It is thus questionable whether temporal proximity would give rise to a reasonable inference of causation here. *Compare, e.g.*, *Rucano v. Annucci*, 18-CV-218, 2021 WL 3293504, at *21 (N.D.N.Y. May 19, 2021) (no "strong showing" of temporal proximity where more than two months passed between grievance and alleged retaliatory conduct), *with Zimmerman v. Racette*, 17-CV-375, 2020 WL 3038275, at *20 (N.D.N.Y. Jan. 24, 2020) (characterizing two months between grievance and alleged retaliatory false misbehavior report as "close temporal proximity").  Any officer who intended to plant evidence on Plaintiff in order to retaliate certainly had many earlier opportunities to do so.

In any case, temporal proximity alone would be insufficient to establish a causal connection, *Washington*, 681 F. App'x at 46, and here there is a lack of evidence that Milisauskas even knew about Plaintiff's allegations against Jacobs.  The record reflects that Milisauskas knew that contraband had been recovered from Plaintiff on February 20, 2019, while Plaintiff was at CRMC, (ECF No. 61-1 at 040), but there is no evidence that Milisauskas was aware of the February 18, 2019 search, let alone that Plaintiff complained about it.  Conclusory allegations of retaliation by one officer for a complaint made against a different officer, where there is no evidence the allegedly retaliating officer even knew of the complaint, are insufficient

to give rise to an inference of causation.  *See Vasquez v. Rockland County*, 15-CV-8912, 2017 WL 456473, at *5 (S.D.N.Y. Feb. 1, 2017) (collecting cases).  Even if the Court can infer that Milisauskas may have had at least some awareness of the February 18 search and Plaintiff's complaints, that alone does not establish that Milisauskas had a motive to retaliate in this manner.  *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) ("[E]ven assuming that Counselor Wingate knew about [plaintiff's] grievance against Officer Gillespie, [plaintiff] has failed to provide any basis to believe that Counselor Wingate retaliated for a grievance that she was not personally named in.") (collecting cases); *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009)).  Absent some other evidence of retaliatory intent, such as a statement or threat by Milisauskas that might demonstrate such intent,[20] the mere fact that Milisauskas and Jacobs may work together is insufficient to raise a legitimate inference that Milisauskas was retaliating for a complaint made against Jacobs.  *See Roseboro*, 791 F. Supp. 2d at 369 n.23.

The remaining factors do not alter this conclusion.  The evidence with regard to Plaintiff's prior behavior is limited, as his prior misbehavior reports are not before the Court on this motion.  But the facts of this case and Plaintiff's admissions make clear that Plaintiff had at least once, recently, smuggled a significant amount of contraband into the prison.  And Plaintiff testified he had been issued at least one prior misbehavior report for possession of contraband,

---

[20] Although Plaintiff claims Jacobs told him he had "buddies" in the SHU who might retaliate, (P's Depo. at 55:17-56:3), and Milisauskas worked in the SHU, this statement from Plaintiff is hearsay and not admissible against Milisauskas.  Even if it were, there is no evidence that Milisauskas was one of those "buddies," despite the fact that Jacobs may also have worked in SHU.  (*Id.* at 50:6-10.)

(P's Depo. at 8:16-9:11), though he denied having a pattern of bringing drugs into prisons, (*id.* at 85:2-13).  Based on the limited record before me, this factor favors Defendants.

Finally, the parties dispute whether Plaintiff was vindicated at a later disciplinary proceeding, and neither supports their assertion with record evidence.  Plaintiff's prison disciplinary record is not before the Court on this motion.  While Milisauskas asserts in his affidavit that Plaintiff was found guilty of the charges, (Milisauskas Decl. ¶ 7), Plaintiff states that the charges against him were "outright dismissed," (P's Depo. at 64:20-65:2).  There is thus a question of fact whether Plaintiff was vindicated at a later proceeding.

Nonetheless, taken together the circumstances here are simply insufficient to demonstrate the requisite causal connection between Plaintiff's protected conduct and the alleged retaliation.  While there remains some question of fact regarding whether or not Plaintiff was vindicated at the later proceeding, in light of the other factors – particularly the fact that Milisauskas was not involved in the February 18 search and may not have even known about it, and the lack of evidence that he knew a complaint against Jacobs had resulted – that unanswered factual issue is not material to the outcome here, particularly in light of the skepticism and care with which prisoner retaliation claims are to be evaluated.  As such, Defendants' motion is granted with regard to the claim against Milisauskas.

### 2.      Jacobs

Plaintiff alleged in his deposition that Jacobs verbally threatened him in retaliation for his complaints regarding the February 18, 2019 search.  But "verbal harassment, standing alone, does not amount to a constitutional deprivation."  *Cole v. Fischer*, 379 F. App'x 40, 43 (2d Cir. 2010) (summary order).

While Plaintiff's Amended Complaint alleges an incident in which Jacobs came to CRMC on April 17 or 18 and choked and threatened him, his deposition is completely silent on that event.[21]  And because his Amended Complaint is not verified, the Court cannot properly consider the allegations therein on this motion.  (*See* note 1 above.)  Accordingly, the record that the Court may properly consider is bereft of any evidence that this event occurred.

Jacobs states that he never interacted with Plaintiff at CRMC, (Jacobs Decl. ¶ 16), and Defendants have produced a logbook with entries every fifteen minutes covering the duration of Plaintiff's hospital stay, (*see* ECF No. 61-2 at 108-15), as well as a video purportedly depicting an area of the hospital apparently outside of Plaintiff's room on April 18, 2019.  The CRMC records of his stay there in April include no report of any such incident, despite Plaintiff's allegation that he was screaming for help.[22]  While the video in particular is not conclusive – among other issues, it only depicts one of the two days on which Plaintiff states he believes this happened and includes in total less than half an hour of footage – and it is unlikely a visit to threaten and choke an inmate would have been logged, there is no evidence that such an event occurred, and I thus cannot say there is a triable issue of fact.  Accordingly, Defendants' motion with regard to the retaliation charges against Jacobs is granted.

---

[21] While Plaintiff was not specifically asked about this incident at his deposition, he discussed his April hospital stay, which is when he originally alleged this incident happened, without mentioning anything about Jacobs coming to the hospital.  (*See id.* at 62:13-63:4.)  He also talked about other alleged retaliation from Jacobs, including an incident where Jacobs allegedly got him alone to threaten him.  (*See* P's Depo. at 55:2-56:3.)

[22] The record contains no explanation why Jacobs, who had easy access to Plaintiff at Sullivan, would make a special trip to the hospital to threaten Plaintiff, or how an assault that allegedly resulted in Plaintiff screaming for help could have gone unnoticed by hospital staff.

### 3.      "John Doe" Retaliation Claims

Plaintiff alleges that unnamed prison officials were failing to give him food or giving him less than a full portion in retaliation for his complaints related to the February 18, 2019 search. While this would constitute an adverse action in connection with the exercise of a protected right, absent any additional factual detail there is simply no basis upon which a reasonable jury could infer a causal connection between any alleged issues with Plaintiff's food and his protected conduct.  And, in any event, now that discovery has concluded, if Plaintiff cannot identify the John Does, any claims against them must be dismissed.  *See Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 536 n.3 (S.D.N.Y. 2005) (dismissing claims against "John Does" without prejudice where plaintiff failed to identify individuals after discovery).

### 4.      Supervisory Claims Against Keyser

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Colon*, 58 F.3d at 873 (cleaned up).  While *Colon* laid out a special test for supervisory liability outlining five ways a plaintiff could show personal involvement of a supervisor, the Second Circuit has clarified that under the Supreme Court's ruling in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the *Colon* test is invalid and "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). Merely being in the chain of command is not enough to satisfy this standard.  *See id.*  While "'[t]he factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary," *id.* (quoting

*Iqbal*, 556 U.S. at 676) (cleaned up), "[t]he violation must be established against the supervisory official *directly*," *id.* (emphasis added).

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 833). To prevail on a claim that officials have failed to protect an inmate from harm, a plaintiff must demonstrate that, objectively, the conditions of his incarceration posed a substantial risk of serious harm and, subjectively, that the defendant acted with deliberate indifference. *See Farmer*, 511 U.S. at 834; *see Hayes*, 84 F.3d at 620. "[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes*, 84 F.3d at 620. A plaintiff must show that prison officials actually knew of, but disregarded, an excessive risk to his safety: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see Tangreti*, 983 F.3d at 619.

Plaintiff alleges a failure-to-protect claim against Superintendent William Keyser with regard to the alleged retaliation in April by Milisauskas and Jacobs, but he fails to allege or testify to any facts that could give rise to a constitutional claim. Plaintiff's only testimony regarding Keyser's involvement is a claim that Keyser "put a piece of paper under [Plaintiff's] door" sometime in April indicating that OSI was going to call Plaintiff regarding his claims, (P's Depo. at 66:6-12), and then came back a few days later and told Plaintiff that after he finished his time in SHU Keyser was "going to see [about] getting [Plaintiff] back to Sullivan," (*id.* at 66:19-

24).[23]  Even if credited, these allegations do not give rise to a constitutional claim.  Rather, it

appears that Keyser was responding reasonably and allowing OSI to investigate.[24]  No facts are

alleged from which a reasonable jury could conclude that Keyser acted with deliberate

indifference to any known risk; rather, accepting Plaintiff's allegations as true, it is apparent that

Keyser was allowing the investigation into Plaintiff's claims to take its course.  There are no

facts in the record from which I could infer that Keyser knew of a specific risk to Plaintiff from

which he failed to protect him.  Accordingly, Defendants' motion for summary judgement as to

Keyser is granted.

### E.    Discovery Issues

Finally, Plaintiff generally makes complains that Defendants are "hiding facts" and failed

to turn over all documents to which he was entitled.  (ECF No. 69.)  His specific complaints

were addressed in detail in a letter from Defendants on December 3, 2021, and the Court found

that Defendants had fulfilled their discovery obligations.  (*See* ECF No. 73.)  The Court adheres

to that ruling.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 58), send

a copy of this Opinion and Order to Plaintiff, enter judgment for Defendants, and close the case.

---

[23] This latter claim is confusing because the Court understands from Plaintiff's testimony and from Defendants' submissions that Plaintiff was held at Sullivan during all events related to this lawsuit.  It is possible Plaintiff misspoke, or meant that Keyser told him he would be returned to general population, or he is confusing Keyser with the superintendent of a facility to which he was later transferred.

[24] OSI, according to Plaintiff, ultimately found his complaints unsubstantiated.  (P's Depo. 67:9-68:20.)

**SO ORDERED.**

Dated: February 17, 2022
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.