UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JAMES THOMAS,

                                    Plaintiff,

        - against -                                    **OPINION & ORDER**

OFFICER E. JACOBS; SGT. MILLER;                     No. 19-CV-6554 (CS)
SUPERINTENDENT WILLIAM KEYSER;
NURSE LESCANO; SGT. MILISAUSKAS;
and JOHN DOES 1-5 (C.O.),

                                    Defendants.
-------------------------------------------------------------x

<u>Appearances</u>:

James Thomas
Stormville, New York
*Pro Se Plaintiff*

Robert C. Feliu
Assistant Attorney General
Office of the Attorney General of the State of New York
White Plains, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

        Before the Court is Defendants' motion for summary judgment.  (ECF No. 85.)  For the

following reasons, the motion is GRANTED.

## I.    **BACKGROUND**

The following facts are based on Defendants' Local Civil Rule ("L.R.") 56.1 Statement and supporting materials, and Plaintiff's submissions, and are undisputed unless otherwise noted.[1]

---

[1] Plaintiff did not file a responsive Rule 56.1 Statement, and instead submitted only an affidavit, (ECF No. 92 ("P's Aff.")), in response to the instant motion. L.R. 56.1 requires that the party opposing a motion for summary judgment submit a counterstatement responding to the moving party's statement of material facts, indicating which facts are admitted and which the opposing party contends are in dispute and require trial. L.R. 56.1(b). Under the Local Rule, "[i]f the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) (citing L.R. 56.1(c)). (Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations. The Court will send Plaintiff copies of all unpublished decisions cited in this Opinion and Order.) *Pro se* litigants are not excused from this requirement. *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 344 n.4 (S.D.N.Y. 2011). As Defendant served Plaintiff with the requisite notice pursuant to L.R. 56.2, (*see* ECF No. 90), I have discretion to consider any properly supported facts in Defendant's L.R. 56.1 Statement admitted. *Vance v. Venettozzi*, No. 18-CV-748, 2021 WL 4145705, at *3 (N.D.N.Y. Sept. 13, 2021). But granting Plaintiff special solicitude, I have considered his deposition testimony and his affidavit. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement."). Allegations in Plaintiff's Amended Complaint, however, cannot be considered as affirmative evidence in this case because the Amended Complaint (unlike his original Complaint, (ECF No. 1), which I do consider as evidence) was not sworn under penalty of perjury as required under 28 U.S.C. § 1746. *See Rickett v. Orsino*, No. 10-CV-5152, 2013 WL 1176059, at *2 n.5 (S.D.N.Y. Feb. 20, 2013), *report and recommendation adopted*, 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013); *see also Continental Ins. Co. v. Atl. Cas. Ins. Co.*, No. 07-CV-3635, 2009 WL 1564144, at *1 n.1 (S.D.N.Y. June 4, 2009) ("On a motion for summary judgment, however, allegations in an unverified complaint cannot be considered as evidence."); *Biller v. Excellus Health Plan, Inc.*, No. 14-CV-0043, 2015 WL 5316129, at *1 (N.D.N.Y. Sept. 11, 2015) ("[A] plaintiff may not use her unverified pleading to support a factual assertion in her motion for summary judgment."); *Zayas v. Caring Cmty. of Conn.*, No. 11-CV-442, 2012 WL 4512760, at *4 (D. Conn. Oct. 1, 2012) (to the same effect).

Plaintiff also filed an "amended reply" to the instant motion after Defendants had filed their reply and the briefing schedule had concluded. (ECF No. 94.) Defendants argue that the Court should disregard it as an improper surresponse. (*See* ECF No. 95). In light of Plaintiff's *pro se* status, I will consider this filing. *See Rivera v. Gatestone & Co.*, No. 23-CV-35, 2023 WL 5530685, at *2 n.2 (D. Conn. Aug. 28, 2023) ("Although surresponses are not granted as a matter

A.     **Facts**

Plaintiff is incarcerated in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").  (ECF No. 88 ("Ds' 56.1 Stmt.") ¶¶ 1-2.)  During the events relevant to this lawsuit, Plaintiff was held at Sullivan Correctional Facility in Fallsburg, New York.  (*Id.* ¶ 1; ECF No. 87-11 ("P's Depo.") at 6:12-18.)  Plaintiff brings this lawsuit in connection with a search conducted on February 18, 2019 and events thereafter, including a second search on April 16, 2019.

1.     **February 18, 2019 Search**

On February 16, 2019, relatives visited Plaintiff at Sullivan.  (Ds' 56.1 Stmt. ¶ 6.) Plaintiff testified at his deposition that during that visit he received drugs from another inmate, inside several balloons,[2] in exchange for $200 that he gave to his sister to compensate her for visiting.  (*Id.* ¶ 7; P's Depo. at 41:7-42:6.)  He testified that he put some of the balloons in his rectum and swallowed others.  (P's Depo. at 42:2-6.)  He was searched after the visit and officers suspected he had contraband because it looked like he had used Vaseline or some similar substance on his anus.  (Ds' 56.1 Stmt. ¶ 8; P's Depo. at 14:2-13.)  Prison officials placed him in

––––––––––––––––––––

of right, I will nevertheless consider these filings given [plaintiff's] *pro se* status.").  But the surresponse, which purports to be a sworn affidavit, is not notarized and does not otherwise meet the requirements of 28 U.S.C. § 1746.  Accordingly, the Court does not consider the statements in the surresponse as evidence from which Plaintiff can raise a genuine dispute of material fact. In any event, the surresponse is largely repetitive of Plaintiff's affidavit and relies on Plaintiff's interpretation of video evidence of the disputed events, which video the Court has considered in deciding this motion.

[2] Plaintiff testified at his deposition that he did not know what drugs were inside the balloons.  (P's Depo. at 40:16-23.)  The contents of the balloons were later tested and found to be a synthetic form of marijuana (commonly known as "K2") and Buprenorphine (commonly known as one of the active ingredients in Suboxone, which is a brand name for a prescription narcotic commonly used to treat opioid addiction).  (*See* ECF No. 87-1 at 019-020; Ds' 56.1 Stmt. ¶ 31.)  Both substances are prohibited in New York State Prisons.  (Ds' 56.1 Stmt. ¶ 33.)

a dry cell[3] and monitored him one-on-one so they could recover any contraband he had attempted to smuggle into the prison.  (D's 56.1 Stmt. ¶¶ 8-9; Miller Decl. ¶ 4.)

Shortly after 10 a.m. on February 18, 2019, while Plaintiff was still in the dry cell, Defendant Miller, a sergeant employed by DOCCS, spotted pieces of blue balloon on the floor of the cell during a linen exchange.  (Ds' 56.1 Stmt. ¶ 10.)  Miller instructed Defendant Jacobs, a correction officer employed by DOCCS, to pat-frisk Plaintiff, and Jacobs felt something in Plaintiff's pocket.  (*Id.* ¶ 11.)  Jacobs took Plaintiff out of the dry cell and observed Plaintiff "clench[ing]" his buttocks while he was walking.  (*Id.* ¶ 12.)  Miller similarly states he observed an unusual gait.  (*Id.*)  At that point, Miller and Jacobs brought Plaintiff to a designated "strip-frisk room" to conduct a strip frisk.[4]  (*Id.* ¶ 14.)

Surveillance footage from Sullivan's strip-frisk room on February 18, 2019 (the "Sullivan Video")[5] shows the following:  Officers identified by Defendants as Jacobs and Miller, (Ds' 56.1 Stmt. ¶ 4),[6] escorted Plaintiff into the strip-frisk room, (*see* Sullivan Video at 00:46).  Miller

---

[3] Defendants explain that "[a] dry cell is a cell without water which allows for the recovery of ingested or inserted contraband by preventing the contraband from being flushed away in a toilet."  (ECF No. 87-5 ("Miller Decl.") ¶ 4.)

[4] The term "strip frisk," as used by Defendants, means a search in which the inmate removes his clothes and an officer visually inspects his body cavities, including the anus.  *See* DOCCS Directive No. 4910 at 7.  Per DOCCS policy, correction officers can perform a strip frisk upon a determination of probable cause and authorization from a sergeant or higher-ranking officer.  *Id.* at 8.  By contrast, a "body cavity search" under DOCCS policy means physical examination of an individual's "oral and/or genital cavities"; DOCCS policy requires that such a search be performed by a medical professional and authorized by the "Superintendent, Acting Superintendent, or facility Officer of the Day."  *Id.* at 11.

[5] A copy of the video was submitted to chambers as Exhibit B to the Declaration of Janice Powers in connection with Defendants' first motion for summary judgment.  (ECF No. 61-3.)  Defendants resupplied the video via the Declaration of Robert Feliu in support of the instant motion.  (ECF No. 87-3.)

[6] Plaintiff's deposition testimony confirmed the physical description of Jacobs and Miller provided by Defendants.  (P's Depo. at 9:15-10:24.)

stepped into the hallway twice to summon additional officers (who are not parties to this lawsuit), one of whom stood in the room while the other stood in the doorway as Jacobs removed Plaintiff's handcuffs. (*Id.* at 00:55-01:17.) Miller exited, Jacobs and the two non-party officers remained, and Plaintiff began undressing. (*Id.* at 01:18.)

Plaintiff had been facing the wall in the corner of the room, but once he was fully undressed, he turned to face Jacobs and Jacobs pointed toward the wall, apparently ordering Plaintiff to turn back around. (*Id.* at 02:18-:27.) Plaintiff complied but shortly thereafter turned around again and seemingly argued with Jacobs. (*Id.* at 02:29-:35.)[7] Jacobs pointed toward the door and the two unnamed officers began to leave, but Plaintiff turned around a third time, at which point Jacobs grabbed his arm and pushed him against the wall, the two unnamed officers joined Jacobs to assist in the hold, and Miller and another officer came back into the room to observe. (*Id.* at 02:29-:52.) Jacobs and Plaintiff exchanged words, and it appears that Jacobs attempted to move Plaintiff's right arm behind his back in an attempt to cuff him. (*Id.* at 02:53-03:09.) At that point, Plaintiff seemingly resisted, a struggle ensued, and one of the non-party officers pulled out and discharged what Defendants state is pepper spray, which failed to subdue Plaintiff. (*Id.* at 03:10-:14; Ds' 56.1 Stmt. ¶ 24.) As the struggle began, Jacobs held Plaintiff's upper body, restraining him. (Sullivan Video at 03:06-:09.) Jacobs then bent down near the lower half of Plaintiff's body, and the viewer cannot clearly see what Jacobs did for three to four seconds because the bodies of Miller and one of the non-party officers blocked him from the camera's perspective. (*Id.* at 03:09-:13.) Once Jacobs can be fully seen again, he was holding

---

[7] Plaintiff testified at his deposition, and stated in his affidavit, that he is hard of hearing, and because his hearing aids were taken when he was put in the dry cell, he could not clearly hear Jacobs's commands and was turning around to try to read his lips. (P's Depo. at 27:16-28:18, 32:20-33:3; P's Aff. ¶ 1.) But the video reflects that Jacobs issued commands while Plaintiff was facing him, and Plaintiff continued to argue.

Plaintiff's legs as the officers took Plaintiff down to the floor. (*Id.* at 03:14-:16.) Once Plaintiff

was on the ground, Miller dropped down and reached toward Plaintiff's body. (*Id.* 03:21-:29)[8]

Plaintiff then remained still and the officers finished cuffing him. (*Id.* at 03:31-:48.) Once

Plaintiff was still and in handcuffs, Jacobs picked up something from the floor, (*id.* at 03:52-

04:05), which Defendants state was a balloon which had fallen out of Plaintiff's buttocks, (Ds'

56.1 Stmt. ¶ 28).[9]

Plaintiff claims that while he was being cuffed and held against the wall, Jacobs "ha[d]

his fingers inside of [Plaintiff's] rectum" in order to dislodge the contraband. (P's Depo. at

29:10-18; P's Aff. ¶ 1.) Jacobs states that he grabbed Plaintiff's legs and never inserted his

fingers into Plaintiff's anus or rectum. (ECF No. 87-4 ("Jacobs Decl.") ¶¶ 13-14.) Miller states

that what he observed is consistent with Jacobs's account. (Miller Decl. ¶¶ 10-11.)

After the search and struggle, Plaintiff remained on the floor and was unresponsive, so

Miller called for medical assistance. (Ds' 56.1 Stmt. ¶ 34.) Defendant Lescano, a registered

nurse employed by DOCCS, (ECF No. 87-6 ("Lescano Decl.") ¶ 1), came to the strip-frisk room

at about 10:25 a.m. and had Plaintiff transported in a wheelchair to the prison medical clinic,

(Ds' 56.1 Stmt. ¶¶ 35, 37).

Plaintiff did not speak to Lescano when he first reached the medical clinic, (P's Depo. at

37:11-17), and when Lescano tried to take his temperature orally he refused to open his mouth

and spoke through clenched teeth, (D's 56.1 Stmt. ¶ 39). Lescano spotted what looked like a

---

[8] Miller stated in his declaration that he "observed a blue colored balloon between the cheeks of [Plaintiff's] buttocks which started to come loose as the Plaintiff resisted and I dropped to the floor quickly in an attempt to grab it, but was unsuccessful." (Miller Decl. ¶ 11.)

[9] The balloon recovered in the strip-frisk room search was found to contain K2 and Buprenorphine, and K2 was also found in the pockets of Plaintiff's pants (which had been removed prior to the search). (ECF No. 87-1 at 019-020.)

balloon in his mouth, and she and a non-party correction officer ordered him to spit it out, which he did. (Ds' 56.1 Stmt. ¶ 40; P's Depo. at 37:18-22, 39:15-25.) According to Lescano's contemporaneous records and her affidavit, she asked Plaintiff whether he had any other contraband or had swallowed anything, and he responded that he had nothing else and had not swallowed anything. (Ds' 56.1 Stmt. ¶ 40.) According to Plaintiff, when Lescano asked him whether he had swallowed anything, he said he believed he had, and she responded, "[W]ell, that's on you, you're an asshole, you shouldn't have swallowed something." (P's Depo. at 38:19-24.)[10]

Lescano flushed the pepper spray from Plaintiff's eyes, did a visual examination of Plaintiff's body, and treated scrapes on his shoulder and knee. (Ds' 56.1 Stmt. ¶ 41.) According to Lescano, Plaintiff denied any other injuries and acute distress or discomfort, and made no further complaints. (Id. ¶¶ 41-42.)[11] He was then returned to the dry cell where he remained on one-on-one watch. (Id. ¶ 43.) Lescano checked on Plaintiff at the end of her shift, around 2:00 p.m., and he refused medical attention but stated that he wanted to file a Prison Rape Elimination Act ("PREA") complaint; Lescano reported the latter request to the on-duty sergeant. (Id.)

About four hours later, an unidentified nurse and the prison doctor saw Plaintiff, and he told them that he may have swallowed a balloon containing Suboxone and K2. (Id. ¶ 44.) The doctor sent Plaintiff to Catskill Regional Medical Center ("CRMC"), an outside hospital, where

---

[10] In his affidavit, Plaintiff states that after Lescano told him that he "should not have swallow[ed] drugs," he "told her what it was." (P's Aff. ¶ 4.) If, as it appears, he means to say that he told Lescano what drugs he had swallowed, that assertion contradicts his deposition testimony that he did not know what drugs were inside the balloons. (P's Depo. at 40:16-23.)

[11] In his Amended Complaint, Plaintiff alleged that he told Lescano his anus was hurting and bleeding, (ECF No. 21 ("AC") at 7, 13), but Plaintiff did not testify to that effect. (Citations to Plaintiff's Amended Complaint refer to the page numbers generated by the court's electronic filing system.)

he was admitted at 7:34 pm.  (*Id.* ¶¶ 44-45.)  Plaintiff's CRMC records[12] reflect that he was admitted for "accidental drug overdose," "drug ingestion," and "swallowed foreign body," and that he told hospital personnel that he had swallowed a cellophane-wrapped balloon containing sixty 12 milligram Suboxone pills at 10:30 that morning.  (*Id.* ¶ 46.)  While at CRMC, Plaintiff defecated and more Suboxone was recovered.  (*Id.*; ECF No. 87-1 at 041-045.)  He was discharged and returned to Sullivan on February 21, 2019.  (Ds' 56.1 Stmt. ¶ 46.)  Plaintiff did not testify to complaining to any hospital personnel about pain or bleeding in his anus, nor do his hospital records reflect any such complaint or injury.  (*See generally* P's Depo; ECF No. 87-8.)

Plaintiff testified at his deposition that when he returned to Sullivan he was placed in the special housing unit ("SHU") and that he regularly received inadequate portions of meals.  (P's Depo. 49:21-50:19, 54:8-19.)[13]  He also asserted that his mail was delayed.  (*Id.* at 50:19-51:13.) Plaintiff testified that he believes these actions were retaliatory because at one point, Jacobs escorted him back to his cell and told him that if he did not change his statement regarding the search on February 18, he would "have it rough" in the SHU because Jacobs's "buddies work down there," and that Plaintiff "would starve and nobody would believe anything that [he] say[s]."  (P's Depo. at 55:17-56:3.)  Plaintiff asserts he reported this incident to DOCCS's Office of Special Investigations ("OSI").  (*Id.* at 56:4-17.)[14]

---

[12] Plaintiff's CRMC records were submitted to chambers as Exhibit G to the Declaration of Janice Powers in connection with Defendants' first motion for summary judgment.  (ECF No. 61-8.)  Defendants resubmitted the records via the Declaration of Robert Feliu in support of the instant motion.  (ECF No. 87-8.)

[13] Plaintiff testified that he and other inmates wrote grievances to the prison about the food issues.  (P's Depo. at 50:13-19.)  It is unclear whether his testimony is that other inmates wrote grievances on his behalf or if other inmates were experiencing the same issue with inadequate portions.  Neither party has submitted the grievances as evidence.

[14] Neither Party has submitted Plaintiff's reports to OSI or records reflecting OSI's investigation or its resolution.

## 2.     April 16, 2019 Search

On April 16, 2019, Defendant Milisauskas, a sergeant with DOCCS, learned from a superior officer that a confidential informant had reported that Plaintiff had illegal drugs. (Ds' 56.1 Stmt. ¶ 48; ECF No. 87-7 ("Milisauskas Decl.") ¶ 4.) Milisauskas went to Plaintiff's cell and saw him flushing what looked like tobacco. (Ds' 56.1 Stmt. ¶ 49; Milisauskas Decl. ¶ 4.)[15] Plaintiff testified that it was tobacco and that he flushed it because he believed it had been planted in his laundry as a "set up" in further retaliation for his complaints about the February 18 search. (P's Depo. at 58:18-60:12.) Milisauskas ordered a pat frisk and the non-party officer who performed the pat frisk felt a hard object near Plaintiff's groin area. (ECF No. 87-2 at 087; Ds' 56.1 Stmt. ¶¶ 51, 53.) Plaintiff was taken to the strip-frisk room, where he stripped, and (according to Defendants) admitted to having marijuana, which he removed from his buttocks and placed on the floor. (Ds' 56.1 Stmt. ¶ 56.) Plaintiff contests this account, stating that he had no drugs and could not have had drugs because he had not had a visit since returning from the hospital in February. (P's Depo. at 61:24-62:12; P's Aff. ¶ 3.) He asserts that the officers planted the marijuana they claimed to recover from him in the strip-frisk room. (P's Depo. at 61:17-22; P's Aff. ¶ 3.)[16]

---

[15] Tobacco is apparently prohibited in SHU. *See* DOCCS Directive No. 4933 § 302.2.

[16] Plaintiff states he was later given a "ticket" charging him with marijuana possession. (P's Depo. at 64:3-5; P's Aff. ¶ 3.) He states he watched a video of that search with the hearing officer, and he was "showing her everything and all that and she's just thinking in her head, like, this is a damn shame." (P's Depo. at 64:11-17; *see* P's Aff. ¶ 3.) This video was not submitted as evidence and according to Milisauskas's interrogatory answers (provided in a letter submitted by Defendants to the Court), no such video exists. (*See* ECF No. 73 at 5.) Plaintiff further testified that the hearing on the marijuana charge was adjourned, he was never called back, and the charge was "outright dismissed." (P's Depo. at 64:18-65:2; *see* P's Aff. ¶ 3.) In contrast, Milisauskas states in his declaration that Plaintiff was found guilty of the charge at a disciplinary hearing. (Milisauskas Decl. ¶ 7.) Neither party has submitted Plaintiff's prison disciplinary records.

A few hours later, Plaintiff went to the prison medical clinic, claimed to have swallowed synthetic marijuana and Suboxone, and was immediately sent to CRMC. (Ds' 56.1 Stmt. ¶ 61.) Plaintiff states that he lied about swallowing contraband in order to get out of the prison where he was being retaliated against and starved. (P's Depo. at 62:13-63:4; P's Aff. ¶ 2.) Plaintiff stayed at CRMC until April 19 and then was sent back to Sullivan; no contraband was recovered during this hospital stay. (Ds' 56.1 Stmt. ¶ 61.)

Plaintiff alleged for the first time in his Amended Complaint and stated in his affidavit (but did not testify at his deposition), that on April 17 or 18, while he was at CRMC, Jacobs came into his room, put his hands around Plaintiff's neck, and threatened him with worse if he did not change his statement regarding the February 18 search. (AC at 8-9; P's Aff. ¶ 2.) A logbook from the hospital watch of Plaintiff does not reflect that Jacobs saw Plaintiff at CRMC hospital. (Ds' 56.1 Stmt. ¶ 63.)[17]

### B.    Procedural History

Plaintiff filed this lawsuit on July 12, 2019 against Correction Officer Earl Jacobs, Sergeant Ronald Miller, and Superintendent William Keyser. (ECF No. 1.) On September 13, 2019, this case was reassigned from then-Chief Judge Colleen McMahon to me. On December 13, 2019, Defendants filed a pre-motion letter in anticipation of their motion to dismiss. (ECF No. 14.) On January 16, 2020, I held a pre-motion conference at which I granted Plaintiff leave to amend his complaint. (*See* Minute Entry dated Jan. 16, 2020.) Plaintiff filed the Amended

---

[17] Via the Declaration of Robert Feliu, Defendants have provided videos, obtained from CRMC, of surveillance footage of the area outside of Plaintiff's hospital room on April 18, 2019. (ECF No. 87-10.) The videos are eleven short clips, all between approximately thirty seconds and five minutes in length, which show corrections officers in the hallway in a hospital. The person identified by Defendants as Jacobs in the prison surveillance footage from February 18, 2019 does not appear in the clips from CRMC.

Complaint on January 27, 2020, adding as defendants Constance Lescano, R.N., Sergeant

Stephen Milisauskas, and five unnamed "John Doe" correction officers.  (AC.)

On May 11, 2020, Defendants answered the Amended Complaint, (ECF No. 42), and on

May 28, 2020 the Court entered a discovery plan and scheduling order, (ECF No. 45).  The

Court granted two extensions to the discovery schedule, the first based on Plaintiff's

representation that he had not received certain discovery and had been given inadequate time to

review OSI's files with regard to his claims, (*see* Minute Entry dated Dec. 17, 2020), and the

second in order to give Defendants time to respond to interrogatories propounded by Plaintiff

that Defendants' counsel had just received, (ECF Nos. 56, 57).

On April 29, 2021, Defendants filed their first motion for summary judgment.  (ECF No.

58.)  In connection with the motion, Defendants served Plaintiff with the notice required by L.R.

56.2, but they failed to attach to their notice the full text of Federal Rule of Civil Procedure 56

and L.R. 56.1, as required by L.R. 56.2.  (*See* ECF No. 63.)  In response to the motion, Plaintiff

submitted only a one-page "Answer" citing two cases and not attaching any evidence.  (*See* ECF

No. 69.)  On February 17, 2022, the Court issued an Opinion and Order, granting Defendants'

motion for summary judgment.  (ECF No. 76 (the "February 17 Opinion").)  The Court found

that although Defendants failed to attach to their notice the full text of Federal Rule of Civil

Procedure 56 and L.R. 56.1, Plaintiff was put on notice that he was required to submit evidence,

in the form of affidavits or other documents, to respond to Defendants' motion.  (*See id.* at 1

n.1.)

Plaintiff appealed the February 17 Opinion on March 4, 2022.  (ECF No. 80.)  On

February 15, 2024, the Second Circuit, by summary order, vacated the February 17 Opinion and

remanded the case for further proceedings, finding that because Defendants failed to provide

Plaintiff the full text of Federal Rule of Civil Procedure 56 and L.R. 56.1, Plaintiff did not

receive adequate notice of the nature of the summary judgment proceedings.  (ECF No. 81.)

The Second Circuit's mandate issued on March 13, 2024.  (ECF No. 82.)  On April 16, 2024, the

Court held a status conference, at which it directed Defendants to re-file their motion for

summary judgment with a proper L.R. 56.2 notice.  (*See* Minute Entry dated Apr. 16, 2024.)  The

instant motion followed.

## II.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255; *see Jeffreys v.*

*City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) ("When considering a motion for summary

judgment, a court must construe the evidence in the light most favorable to the nonmoving party,

drawing all inferences in that party's favor.").  "In considering a motion for summary judgment,

the Court cannot render credibility assessments, which are reserved for the jury."  *Jordan v.*

*Gifford*, No. 19-CV-1628, 2022 WL 3106965, at *21 (D. Conn. Aug. 4, 2022).

The movant bears the initial burden of demonstrating "the absence of a genuine issue of

material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence

sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d

Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  "If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

In addition, *pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).  But "[a] *pro se* party's

bald assertion, unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Walker v. Vaughan*, 216 F. Supp. 2d 290, 296-97 (S.D.N.Y. 2002).

Even where a *pro se* non-moving party fails to meaningfully respond to the movant's summary judgment motion at all, "courts may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial, and in doing so, may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement."  *Murray v. Dabo*, No. 22-CV-4026, 2024 WL 1421119, at *4 (S.D.N.Y. Feb. 2, 2024), *report and recommendation adopted*, 2024 WL 964599 (S.D.N.Y. Mar. 5, 2024).  Thus, the Court "may grant an unopposed motion for summary judgment against a *pro se* plaintiff if:  (1) the *pro se* plaintiff has received adequate notice that failure to file a proper opposition may result in dismissal of the case; and (2) the facts as to which there is no genuine dispute show that the moving party is entitled to a judgment as a matter of law."  *Id.*  "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented."  *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

## III.    DISCUSSION

The Court construes Plaintiff's submissions "liberally" and "interpret[s] them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  Plaintiff advances claims against Jacobs under the Fourth and Eighth Amendments, against Miller and Lescano under the Eighth Amendment, and against Lescano under the Equal Protection Clause of the Fourteenth Amendment.  He also asserts First Amendment retaliation

claims against Milisauskas, Jacobs, and several "John Doe" officers, and a failure-to-protect claim against Keyser.[18]

A.    **Fourth Amendment Claim**

Plaintiff asserts a Fourth Amendment claim against Jacobs regarding the February 18, 2019 search.  (AC at 10.)  While "a prisoner's rights to be free from unreasonable searches is diminished once he or she steps through the prison door," *Harris v. Keane*, 962 F. Supp. 397, 407 (S.D.N.Y. 1997), "inmates do retain a limited right to bodily privacy" under the Fourth Amendment, *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016).  "First, the court must determine whether the inmate has exhibited an actual, subjective expectation of bodily privacy."  *Harris*, 818 F.3d at 57.  Such expectation must be one that "society would consider . . . reasonable." *Forde v. Zickefoose*, 612 F. Supp. 2d 171, 182 (D. Conn. 2009); *see White v. Doe*, No. 16-CV-1874, 2021 WL 4034164, at *4 (D. Conn. Sept. 3, 2021).  While any subjective expectation by Plaintiff that he would not be subject to a strip frisk and visual cavity inspection may not have been reasonable – considering that he attempted to smuggle contraband by swallowing it and hiding it in his body cavity, and knew he was suspected of the same – it is a closer question whether it is reasonable to assume that no one would manually dislodge that contraband if it were found.  But even if it were not reasonable for Plaintiff to assume as a general matter that no one would manually dislodge the contraband, I will assume without deciding that he had a reasonable subjective expectation that the manual removal would not occur in the sudden and painful manner he describes.  *See Harris*, 818 F.3d at 57.

_____

[18] Plaintiff's Amended Complaint also states Fourteenth Amendment claims against Jacobs, Miller, Keyser, and Milisauskas, but the theory of those claims is not clear to the Court, and they are based on the same allegations as the other claims.  To the extent Plaintiff intended an equal protection claim, it would fail for the reasons set forth below in connection with the equal protection claim against Defendant Lescano.

Because I am assuming that Plaintiff had at least some reasonable subjective expectation of privacy, I must assess the official's justification for the challenged search. *Id.* Where, as here, "the inmate's claim challenges an isolated search, rather than a regulation or policy, courts typically apply the standard set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979)" to assess the reasonableness of the search. *Torres v. City of N.Y.*, No. 17-CV-6604, 2019 WL 7602181, at *10 (S.D.N.Y. Aug. 14, 2019), *report and recommendation adopted*, 2019 WL 4784756 (S.D.N.Y. Sept. 30, 2019). The *Bell* test looks to (1) "the scope of the particular intrusion," (2) "the manner in which it is conducted," (3) "the justification for initiating it, and" (4) "the place in which it is conducted." *Bell*, 441 U.S. at 559.

### 1.     Scope of Intrusion

"[T]he scope of the intrusion . . . varies with the type of search." *Harris*, 818 F.3d at 58. The Second Circuit has explained:

> There are at least three types of searches that implicate an inmate's right to bodily privacy:
>
> A "strip search," though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities.

*Id.* Whether the officer performing the search is "of the same gender as the inmate" – as was the case here – is also relevant to the scope of intrusion. *See id.*

All the officers involved here were male, but the parties disagree whether the search, which started as a visual body cavity search (although that search never really took place), escalated into a manual body cavity search. Defendants assert that contraband came loose and fell out as the officers held Plaintiff to the floor, (Ds' 56.1 Stmt. ¶ 28), but Plaintiff asserts that Jacobs inserted his fingers into his anus and rectum to dislodge the contraband, (P's Depo. at

29:10-18; P's Aff. ¶ 1).  Jacobs and Miller both state that Jacobs did not insert his fingers into Plaintiff's anus or rectum.  (Jacobs Decl. ¶¶ 13-14; Miller Decl. ¶¶ 10-11.)

Video of the search does not completely rule out the possibility that Jacobs used some form of physical contact or force to dislodge the contraband.  While at no point is Jacobs seen to insert his finger into Plaintiff's anus, for three to four seconds Jacobs is partially out of view.  Based on his actions just before and just after that short period, it appears he is simply struggling with Plaintiff and attempting to secure his legs; as he comes back into view he is holding Plaintiff's legs, taking him down to the floor.  Those three to four seconds are in all likelihood not enough time for Jacobs to have searched Plaintiff the way Plaintiff claims.  Nevertheless, because the video does not unambiguously show that Jacobs applied no force to dislodge the contraband from Plaintiff's buttocks, I cannot foreclose the possibility that a jury could credit Plaintiff's testimony and find that there was at least some contact.  *See Jones v. Falco*, No. 20-CV-3485, 2022 WL 3668358, at *5 (S.D.N.Y. Aug. 25, 2022).  A manual body cavity search is not "*per se* unreasonable," but "the highly intrusive nature of the search, even if conducted by male correction officers, weighs in favor of a finding that the search was unreasonable."  *Torres*, 2019 WL 7602181, at *12; *see Layne v. Panzarella*, No. 19-CV-4531, 2022 WL 2343184, at *5 (S.D.N.Y. June 29, 2022).  Given that a jury could find that at least a partial manual search was used to obtain the contraband here, this factor weighs in favor of finding the search unreasonable.

### 2.    Manner in Which the Search Was Conducted

A search conducted in a professional manner is more likely to be reasonable than one that is not.  *Harris*, 818 F.3d at 59-60.  Here, the search began in a professional manner, but devolved when Plaintiff turned around multiple times.  The video of the event produced by Defendants

includes no sound, so the exact nature of the argument cannot be heard.  The video shows that Jacobs was issuing commands (while Plaintiff is looking at him) and Plaintiff turned around three times to argue with Jacobs.  Jacobs eventually pins Plaintiff to the wall, and two additional officers restrain Plaintiff.  Plaintiff attempted to either jerk free of or resist Jacobs's grip, and is then taken to the floor and handcuffed.  At some point the contraband comes free (as discussed, potentially after being manually dislodged by Jacobs).

In *Torres*, it was undisputed "that, in order for the Officer Defendants to recover the contraband, they not only restrained Plaintiff, but forced him to the ground, held him down, spread his legs, and forcibly removed the contraband from inside his body."  2019 WL 7602181, at *12.  On those facts, the court found that "[t]he Officer Defendants have offered no legitimate penological justification for recovering the observed contraband in this manner, when alternatives were likely available to recover it without the use of force" – including placing the plaintiff in a dry cell or allowing medical personnel to perform the search.  *Id.*  Accordingly, the court found that the degree of force used appeared to be unreasonable.  *Id.*; *see Layne*, 2022 WL 2343184, at *5 (crediting plaintiff's testimony that defendants "sprayed him with mace, tackled him to the ground, and kicked him before . . . spread[ing] his buttocks, and perform[ing] an anal cavity search," and thus finding that the manner of the search was unreasonable).

Here, it is disputed whether any force was used to dislodge the contraband, but the Court must assume for purposes of the motion that it was.  One of the alternatives mentioned by the *Torres* court – sending Plaintiff back to the dry cell – does not seem to have been feasible here, as the presence of the balloon fragment in the dry cell suggests that Plaintiff had, despite his placement there, succeeded in secreting and perhaps consuming the contents of a balloon.  But the other option – taking him to the medical unit – was available.  Moreover, DOCCS procedures

called for medical personnel to perform any manual search.  (*See* note 4 above.)  That fact alone

does not make the search unconstitutional, *see, e.g.*, *Jenkins v. City of N.Y.*, No. 18-CV-7024,

2020 WL 6700087, at *3 (E.D.N.Y. Nov. 12, 2020) (violation of DOCCS policy "does not, in

and of itself, constitute a cognizable constitutional claim"), but it is relevant to the

reasonableness of the manner of the search, *see Torres*, 2019 WL 7602181, at *12 n.8.  But any

use of force used to dislodge the contraband here occurred before Plaintiff was fully restrained,

and given that the officers did not know what contraband Plaintiff possessed, the security risk

was unknown.  Accordingly, this factor weighs only moderately against finding that the search

was reasonable.

### 3.    The Justification for Initiating the Search

This factor calls on the Court to assess the record evidence supporting the officials'

justification for the search, *Harris*, 818 F.3d at 60, setting aside the manner in which the search

was conducted, *Torres*, 2019 WL 7602181, at *13.  Here the record fully justifies the search.

Plaintiff was in a dry cell because of reasonable suspicion that he was attempting to bring in

contraband.  Miller saw a piece of balloon, leading him to further suspect the presence of

contraband, and that suspicion was further bolstered when both Miller and Jacobs observed

Plaintiff walking as though he had something hidden in his buttocks.  Plaintiff verbally and then

physically resisted a visual search.  Even without the resistance, there was ample cause to believe

Plaintiff was secreting contraband and thus that it had to be removed.  The resistance only

solidified that need.  Accordingly, this factor weighs in favor of reasonableness.

### 4.    Place in Which the Search Was Conducted

"[A] strip search or a body cavity search conducted in the presence of unnecessary

spectators is less reasonable than one conducted in the presence of only those individuals needed

19

to conduct the search." *Harris*, 818 F.3d at 62.  The search here was conducted in a private strip-frisk room.  The video reflects that during the search, prior to the struggle, between one and three additional officers were present in the room or observing from the doorway.  Given security concerns this does not strike the Court as excessive or unnecessary, and weighs in favor of reasonableness.

### 5.    Qualified Immunity

In light of the above, it is a close question whether this search was reasonable and thus in line with the Fourth Amendment.  But the Court need not resolve that question decisively, or leave it for a jury to determine, because, to the extent the search was unreasonable, Jacobs is entitled to qualified immunity on Plaintiff's Fourth Amendment claim.

"A defendant is entitled to qualified immunity if (1) the defendant's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for the defendant to believe that his actions were lawful at the time of the challenged act."  *Brandon v. Kinter*, 938 F.3d 21, 39 (2d Cir. 2019).  "'Clearly established law' should not be defined 'at a high level of generality'" and while the court does not need to identify a case "directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate."  *White v. Pauly*, 580 U.S. 73, 79 (2017) (*per curiam*) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  "[Q]ualified immunity 'protects all but the plainly incompetent or those who *knowingly* violate the law.'"  *Berg v. Kelly*, 897 F.3d 99, 109 (2d Cir. 2018) (emphasis in original) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

The *Torres* court found that officers were entitled to qualified immunity on facts similar to those presented here:

> Plaintiff has not pointed to, and this Court is not aware of, any case law providing that correction officers who have a legitimate penological justification for conducting a body-cavity search of an inmate for suspected contraband, and who conduct such a search in a private setting and with officers of the same gender as the inmate, are then constitutionally prohibited from using force to remove an object observed to be protruding from the inmate's anus. Even if this Court were to conclude that this constituted a violation, this Court is persuaded that it was "objectively reasonable" for the Officer Defendants to believe that their actions in recovering the contraband were lawful, such that they are entitled to qualified immunity from any civil liability.

2019 WL 7602181, at *14.

I am persuaded by the analysis in *Torres*. *Torres* was decided in 2019, and I am not aware of any precedent that court did not cite (or, for that matter, any case decided since) that decisively addresses this issue. It thus remains the case that a reasonable officer in Jacobs's position, with strong reason to believe contraband was in Plaintiff's anus, could have believed his alleged action to be lawful.[19] Accordingly, Defendants' motion for summary judgment on the Fourth Amendment claim is granted.

### B.    Eighth Amendment Excessive Force and Sexual Assault Claims

Plaintiff advances an Eighth Amendment claim against Jacobs. (AC at 10.) Read to raise the strongest arguments it suggests, the Amended Complaint states both an excessive force claim for the search and alleged penetration, and a sexual abuse claim under the Eighth Amendment. I address each in turn.

### 1.    Excessive Force

---

[19] To the extent Plaintiff intended to advance a claim of failure to intervene against any other official, such a claim would be dismissed. Assuming Jacobs digitally penetrated Plaintiff for a few seconds, there is no way anybody else had a reasonable opportunity to intervene, *see Ekukpe v. Santiago*, 823 F. App'x 25, 32 (2d Cir. 2020) (summary order) (no liability for failure to intervene unless the officer "had a realistic opportunity to intervene to prevent the harm from occurring"), and in any event any such official would be entitled to qualified immunity for the same reasons as Jacobs.

An Eighth Amendment claim generally requires a subjective and objective showing.  *See Harris*, 818 F.3d at 63.

> The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct.  For excessive force claims, as contrasted with other actions or inactions that rise to the level of Eighth Amendment violations, the test for wantonness is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

> To determine whether defendants acted maliciously or wantonly, a court must examine several factors including:  the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

> Accordingly, determining whether officers used *excessive* force necessarily turns on the need for the force used.

*Id*. at 63-64; *see Seweid v. Cnty. of Nassau*, No. 21-CV-3712, 2024 WL 693981, at *7 (E.D.N.Y. Feb. 20, 2024).

Second, the objective inquiry looks to whether "the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions," an inquiry that is "context specific" and turns on "contemporary standards of decency."  *Harris*, 818 F.3d at 64.  "[W]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated."  *Id.*  The objective element "is satisfied in the excessive force context even if the victim does not suffer serious, or significant injury, as long as the amount of force used is not *de minimis*."  *Id.*  But "the extent of injury suffered is relevant to the Eighth Amendment inquiry insofar as it indicates the amount of force applied."  *Rodriguez v. City of N.Y.*, 802 F. Supp. 2d 477, 481 (S.D.N.Y. 2011).

Applying these principles, and crediting Plaintiff's version of events, a reasonable jury could not conclude that the force here was objectively harmful enough to violate the Eighth

Amendment. Plaintiff's medical records indicate that his injuries after the search were minor – it is undisputed that he was treated only for pepper spray in his eyes and scrapes on his shoulder and knee. As I discuss in greater detail below, there is no evidence that he told Lescano or any hospital personnel at CRMC about any injury to his anus, but even if there were, the objective prong would not be met.

In *Torres*, the court found that plaintiff did not satisfy the objective prong of the Eighth Amendment analysis, even though officers indisputably held the plaintiff down and removed contraband from his anus, and two days later medical personnel assessed the plaintiff as having a "small pinkish mass outside his anus," which the court there characterized as *de minimis*. 2019 WL 7602181, at *8. Here, there is no evidence in the record of any injury to that part of Plaintiff's body. The condition for which he was hospitalized was unrelated to any action taken during the search by Jacobs or any other officer. Even if there was some temporary rectal bleeding, that is not surprising when a foreign object has passed through, and would not suffice under the Eighth Amendment. *See Torres*, 2019 WL 7602181, *8 (in Eighth Amendment analysis "modest bleeding is generally insufficient to demonstrate the necessary severity" to satisfy objective prong). Accordingly, the Court must conclude that the force used here was *de minimis* and simply not objectively harmful enough to reach constitutional dimensions.

Even if it were, there is no indication that Jacobs's purpose was to maliciously and sadistically cause harm, as opposed to retrieve what he reasonably believed was contraband the discovery of which Plaintiff was resisting. Any injury was minimal; Jacobs did not gratuitously punch or kick Plaintiff, but rather (assuming Plaintiff's version to be true) went after the contraband; Plaintiff plainly was trying to forestall the recovery of the item; and once it was obtained the use of force ceased. A reasonable jury could not find that Jacobs's motive in

searching for the then-unknown contraband was not to find it, but rather to gratuitously harm Plaintiff.

### 2.    Alleged Sexual Assault

Plaintiff also asserts that the search constituted a sexual assault in violation of the Eighth Amendment.  (AC at 7; P's Aff. ¶ 1.)  With regard to such claims in this context, the Second Circuit has explained:

> [P]rison officials looking for contraband may subject inmates to reasonable strip searches and cavity searches.  Indeed prison security and safety may require frequent searches of an intensely personal nature – and not every such search is properly the subject of a lawsuit.  Searches that do not uncover contraband may be no less penologically justified than those that do.  And even an officer who is meticulous in conducting a search does not violate an inmate's constitutional rights as long as the officer had no intention of humiliating the inmate or deriving sexual arousal or gratification from the contact.  But a search may not be undertaken maliciously or for the purposes of sexually abusing an inmate.

*Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015); *see Hayes v. Dahlke*, 976 F.3d 259, 275 (2d Cir. 2020) ("Our principal inquiry in determining if there was an Eighth Amendment violation is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate.").  There is simply no evidence in the record from which a reasonably jury could conclude that this search was undertaken for purposes of humiliation or sexual gratification.  For the reasons already discussed, initiation of the search was justifiable, and it was limited to the area where contraband was reasonably expected to be.  Even accepting Plaintiff's version of events that he was digitally penetrated, the video reflects that this contact could not possibly have been more than momentary.

Accordingly, Defendants' motion is granted as to the Eighth Amendment claims against Jacobs.  To the extent Plaintiff brings failure-to-intervene or supervisory claims in connection with this search against Miller or Lescano, such claims cannot be sustained where there is no

underlying constitutional violation, and, as noted, there would have been no opportunity to intervene in any event.  (*See* note 19 above.)  Thus, all such claims are also dismissed.

**C.    Eighth and Fourteenth Amendment Claims Against Lescano**

**1.    Eighth Amendment Deliberate Indifference**

Based on Plaintiff's allegations, deposition testimony and affidavit, the most plausible claim against Lescano is a medical indifference claim under the Eighth Amendment, which is how Defendants interpret the claim in their memorandum of law.  (ECF No. 86 ("Ds' Mem.") at 17-18.)

The Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  But "not every lapse in medical care is a constitutional wrong," and "a prison official violates the Eighth Amendment only when two requirements" – one objective and one subjective – "are met." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).

First, the prisoner must prove, objectively, that he was "actually deprived of adequate medical care[,] . . . [as] the prison official's duty is only to provide reasonable care," *id.* at 279 (citing *Farmer*, 511 U.S. at 844-47), and "that the alleged deprivation of medical treatment [wa]s . . . 'sufficiently serious' – that is, the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain,'" *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)); *see Williams v. Raimo*, No. 10-CV-245, 2011 WL 6026115, at *3 (N.D.N.Y. July 22, 2011) ("no distinct litmus test" for determining whether medical condition is "serious," but court may look at non-exhaustive list of factors, including whether (1) impairment is one that reasonable doctor would find important and worthy to treat, (2) condition affects individual's daily life, and (3)

prisoner suffers from chronic and substantial pain), *report and recommendation adopted*, 2011 WL 6026111 (N.D.N.Y. Dec. 2, 2011).

Where a plaintiff's medical indifference allegations amount to a delay in treatment, "it is appropriate to focus on the challenged *delay* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." *Ray v. Zamilus*, No. 13-CV-2201, 2017 WL 4329722, at *9 (S.D.N.Y. Sept. 27, 2017) (emphasis in original). On the one hand, "[a] defendant's delay in treating an ordinarily insignificant medical condition can become a constitutional violation if the condition worsens and creates a substantial risk of injury." *Id.* But on the other, "delay in treating a life-threatening condition may not violate the Eighth Amendment if the lapse does not cause any further harm beyond that which would occur even with complete medical attention." *Id.*; *see Pabon v. Wright*, No. 99-CV-2196, 2004 WL 628784, at *8 (S.D.N.Y. Mar. 29, 2004) ("A delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces a conscious disregard of a substantial risk of serious harm . . . . The Second Circuit has reserved such a classification for cases in which, for example, officials deliberately delayed medical care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.").

Second, the prisoner must prove, subjectively, that the charged official acted with a sufficiently culpable state of mind. *Salahuddin*, 467 F.3d at 280-81; *see Farmer*, 511 U.S. at 835 ("[D]eliberate indifference entails something more than mere negligence . . . [but] it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."). The inmate must prove that the charged official knew of and disregarded "'an excessive risk to inmate health or safety; the official must [have] both be[en]

aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . must also [have] draw[n] the inference.'"  *Johnson*, 412 F.3d at 403 (quoting *Farmer*, 511 U.S. at 837); *see Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) (*per curiam*) (equating "deliberate indifference" with criminal "recklessness").

"It is well-established that [neither] mere disagreement over the proper treatment," *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998), nor "[m]edical malpractice . . . become a constitutional violation merely because the victim is a prisoner," *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Rather, to state an Eighth Amendment deliberate indifference claim, an inmate "must demonstrate that the defendants acted or failed to act while actually aware of a substantial risk that serious inmate harm would result."  *Farid v. Ellen*, 593 F.3d 233, 248 (2d Cir. 2010). "[P]rison officials . . . may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844.

Plaintiff's claim against Lescano has changed since he filed the Amended Complaint, in which he alleged that he told Lescano, in the wake of the search on February 18, 2019, "that his anus was hurting" and "bleeding," and she responded that "nothing should have been up there." (AC at 7, 13.)  But when questioned about his interactions with Lescano at his deposition, Plaintiff did not mention any exchange regarding pain or bleeding in his anus; rather, he testified that he told Lescano that he may have swallowed a balloon full of contraband, and that Lescano did nothing in response.  (P's Depo. at 38:19-24.)  This allegation was not in original Complaint or the Amended Complaint.

Regardless, there is no evidence in the record that would support a jury verdict for Plaintiff on either of these allegations.  First, with regard to the unsworn allegations in Plaintiff's Amended Complaint, Lescano states that "[a]t no point did the plaintiff state he had a bleeding

anus or did I observe any blood from his rectal area or bleeding anywhere in the clinic."

(Lescano Decl. ¶ 5.)  Contemporaneous notes by Lescano in Plaintiff's Ambulatory Health

Record ("AHR") corroborate her account:  nothing in her notes about his initial visit reflect any

statements about pain in that area; it was only on checking in with Plaintiff at the end of her shift,

that Plaintiff apparently mentioned something about wanting to make a PREA complaint.  (ECF

No. 87-9 at 001.)  Lescano noted that Plaintiff had not discussed any PREA-related incident or

event with her.  (*Id.*)  Further, Plaintiff's medical records from CRMC (where he was sent only

hours later) reflect nothing regarding any complaint about or treatment of an injury in that part of

his body.  In short, there is no evidence that Plaintiff ever told Lescano about this alleged injury,

and thus it is undisputed at this stage that he did not.

      Moreover, even if the account in Plaintiff's Amended Complaint could be credited, he

does not describe an injury that would be objectively sufficiently serious to trigger a medical

indifference claim.  *See Jordan v. Gifford*, No. 19-CV-1628, 2022 WL 3106965, at *23 (D.

Conn. Aug. 4, 2022) (collecting cases for the proposition that "minor injuries such as cuts,

bruises, or soft tissue injuries" do not constitute a "serious medical need") , *adhered to on*

*reconsideration,* 2023 WL 2895883 (D. Conn. Apr. 11, 2023); *Young v. Choinski*, 15 F. Supp. 3d

172, 183-84 (D. Conn. 2014) (collecting cases for the proposition that abrasions with minor

bleeding do not constitute a "serious medical need").  While "visible and profuse rectal

bleeding" can constitute a serious medical need, *Bright v. Annucci*, No. 18-CV-11111, 2024 WL

3012043, at *8 (S.D.N.Y. June 13, 2024), there is no evidence that Plaintiff's bleeding rose to

that level.  Moreover, given that Plaintiff was seen at the hospital within eight hours or so, the

question is whether the alleged delay from Lescano's alleged disregard of Plaintiff's complaint

of bleeding is sufficiently serious, *see, e.g., Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir.

2003), and Plaintiff does not allege that that delay caused him any harm, *see Young-Flynn v. Wright*, No. 05-CV-1488, 2007 WL 241332, at *18 (S.D.N.Y. Jan. 26, 2007) (dismissing where plaintiff did not allege that "defendants' failure to take any action to address his rectal bleeding directly caused him any specific injury"). Thus, even if there were evidence of Plaintiff telling Lescano about rectal bleeding, the condition would not rise to the level required under the first prong of the Eighth Amendment test.

Second, Plaintiff's testimony that he told Lescano that he may have swallowed a balloon with unknown contraband, taken as true, similarly does not establish an objectively serious medical condition. Although a balloon may burst and lead to a serious and potentially life-threatening medical condition, "when the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate," as noted, "to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Smith*, 316 F.3d at 185 (emphasis in original). There is no evidence that the delay between Lescano treating Plaintiff some time in the late morning and Plaintiff arriving at CRMC at 7:34 pm worsened his condition seriously (or at all), or caused any additional medical complications. Accordingly, Lescano's alleged inaction clearly did not "cause any further harm beyond that which would occur even with complete medical attention," *Ray*, 2017 WL 4329722, at *9, and thus does not satisfy the objective prong of the deliberate indifference analysis.

Nor do Lescano's alleged actions bespeak deliberate indifference sufficient to meet the subjective prong necessary to give rise to a constitutional claim. The AHR reflects that Lescano initially called the prison doctor, informed him of the incident, and sent Plaintiff back to the dry

cell where he would be under one-on-one observation.  (ECF No. 87-9 at 001.)  Beyond bringing

the situation to the attention of the prison doctor – who apparently did not order any additional or

different treatment – she also checked up on Plaintiff within a few hours of her initial exam

before her shift was over, and he refused medical treatment at that time.  (*Id.*)  That the doctor

and nurse who examined Plaintiff later in the evening (and who were told by Plaintiff that he

may have swallowed K2 and Suboxone) saw fit to send him out to the hospital amounts to

"disagreement over the proper treatment," or – at most – negligence on Lescano's part, neither of

which are constitutionally cognizable.  *See Chance*, 143 F.3d at 703; *Hathaway v. Coughlin*, 37

F.3d 63, 66 (2d Cir. 1994).[20]

Accordingly, even crediting the late-raised allegation that Plaintiff told Lescano in his

initial exam that he thought he had swallowed something and the unsupported allegation about

rectal bleeding, the record does not support the conclusion that Lescano was deliberately

indifferent or that her alleged inaction deprived Plaintiff of adequate medical care.

Thus, the Eighth Amendment claim against Lescano fails.

## 2.    Fourteenth Amendment Equal Protection Claim

In the Amended Complaint, Plaintiff characterizes the claim against Defendant Lescano

as arising under the Fourteenth Amendment's Equal Protection Clause.  (AC at 10.)  In general,

to establish an equal protection claim, a plaintiff must show (1) "adverse treatment . . . compared

with other similarly situated individuals," and (2) "that such selective treatment was based on

---

[20] Nor would the unsworn allegation regarding bleeding show that Lescano was subjectively indifferent.  "There is no evidence that [Plaintiff] told [Lescano] the duration, frequency, or severity of his rectal bleeding.  There is no evidence that [Lescano] believed that [Plaintiff's] condition would deteriorate if left untreated, nor that [Lescano] understood [Plaintiff] to be at serious risk in the absence of more aggressive treatment or screening."  *Green v. Shaw*, 827 F. App'x 95, 97-98 (2d Cir. 2020) (summary order).

impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Miner v. Clinton County*, 541 F.3d 464, 474 (2d Cir. 2008); *see Avila v. N.Y.C. Hous. Auth.*, No. 24-CV-6680, 2024 WL 4627461, at *3 (S.D.N.Y. Oct. 25, 2024); *Marom v. Town of Greenburgh*, No. 13-CV-4733, 2015 WL 783378, at *9 (S.D.N.Y. Feb. 23, 2015).  Nothing in the record or in Plaintiff's testimony establishes that he was treated differently by Lescano as compared to any other similarly situated inmate, much less that any differential treatment was based on an impermissible consideration or bad faith intent to injure him.

As such, Defendants' motion for summary judgment on the claims against Lescano is granted.

### D.    Retaliation Claims

Plaintiff alleges retaliatory conduct by Defendants Milisauskas, Jacobs, and several unnamed "John Doe" defendants, and a failure-to-protect claim against Keyser related to others' retaliatory conduct.  (AC at 9-11.)

#### 1.    Milisauskas

Plaintiff's claims against Milisauskas amount to a claim that Milisauskas planted drugs on Plaintiff (or oversaw another officer who was doing so) in retaliation for his complaint against Jacobs.[21]

The Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation –

---

[21] Neither party has provided any grievance Plaintiff filed against Jacobs, but based on Plaintiff's deposition testimony, it appears he made a PREA complaint based on the alleged search of his rectum on February 18, 2019.  (*See* P's Depo. at 68:21-70:3.)

can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015); *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike."); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (skepticism warranted by "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated").

"To establish a First Amendment retaliation claim, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon*, 938 F.3d at 40. But "[t]he defendant may nonetheless avoid liability by showing that he or she would have taken the adverse action even in the absence of the protected conduct." *Id.*

As to the first factor, the law is clear that by filing complaints against correction officers, Plaintiff was engaged in protected activity. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[Plaintiff] has sufficiently alleged . . . participation in protected activity: the use of the prison grievance system . . . ."); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ("[I]ntentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.")); *Mitchell v. Chappius*, No. 17-CV-6673, 2024 WL 4280829, at *14 (W.D.N.Y. Sept. 25, 2024) ("The filing of prison grievances is a constitutionally protected activity."); *Morgan v. Dzurenda*, No. 14-CV-966, 2017 WL 1217092, at *12 (D. Conn. Mar. 31, 2017) ("The filing of grievances is a constitutionally protected activity . . . ."); *Pledger v. Hudson*, No. 99-CV-2167, 2005 WL 736228, at *4 (S.D.N.Y. Mar. 31, 2005) ("A prisoner's

filing of an internal prison complaint against an officer is protected by the First Amendment . . . .").  Thus, Plaintiff has satisfied the first element of his retaliation claim.

As to the second factor, the Second Circuit "define[s] adverse action *objectively*, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights."  *Gill*, 389 F.3d at 381 (emphasis in original).  If the retaliatory conduct does not rise to that level, "the retaliatory act is simply *de minimis*, and therefore outside the ambit of constitutional protection."  *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011); *see Wright v. Snyder*, No. 21-CV-104, 2023 WL 6379451, at *9 (D. Conn. Sept. 30, 2023).  "[T]he planting of evidence and issuance of a false misbehavior report based upon that evidence has been found to constitute adverse action for purposes of a retaliation claim."  *Henson v. Gagnon*, No. 13-CV-590, 2015 WL 9809874, at *10 (N.D.N.Y. Dec. 10, 2015) (collecting cases), *report and recommendation adopted*, 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016).  Further, courts have concluded that non-routine strip searches, for which an inmate is singled out, "could deter a typical prisoner from exercising his or her First Amendment rights" and thus constitute an adverse action for purposes of the retaliation analysis.  *Johnson v. Naqvi*, No. 18-CV-694, 2021 WL 1723773, at *8-9 (D. Conn. Apr. 29, 2021).

Thus, Plaintiff identifies two potentially adverse actions involving Milisauskas:  the April 16, 2019 strip search itself, which Milisauskas allegedly authorized, and the subsequent allegedly false misbehavior report based on the recovery of drugs, which he claims were planted on him by Milisauskas or one of the other officers in the room during the strip search.  The parties dispute whether the search was pretextual, and whether the drugs were planted.  Given that dispute, there is a question of fact whether an adverse action occurred.

As to the third factor, circumstantial evidence may demonstrate the necessary causal connection between a plaintiff's protected speech and an official's adverse action. Courts look to the "temporal proximity between an inmate's grievance and alleged retaliation"; "[p]roof of prior good behavior by the inmate"; and "vindication in a disciplinary proceeding arising from the alleged retaliation," *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 240 (S.D.N.Y. 2005), as well as knowledge by the alleged retaliator of the incident that is the subject of the grievance or complaint, *see Espinal v. Goord*, 558 F.3d 119, 129-30 (2d Cir. 2009) (finding sufficient circumstantial evidence that officer who was alleged to engage in retaliation knew of inmate's suit against other officers). Temporal proximity alone is insufficient to establish the requisite causal connection. *See Morrow v. Bauersfeld*, No. 21-2928, 2022 WL 17097590, at *2 (2d Cir. Nov. 22, 2022) (summary order) ("[W]e have repeatedly held that temporal proximity alone is insufficient for a prisoner's retaliation claim to survive summary judgment."); *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (summary order) ("Although we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim.") (citing *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003)).

With regard to temporal proximity, the Second Circuit has eschewed bright line tests in favor of a context-specific analysis. *Espinal*, 558 F.3d at 129. Here, the alleged wrongful search occurred nearly two months after Plaintiff initiated the complaint process against Jacobs for the February 18 search. While Plaintiff asserts that he was still subject to ongoing retaliation from unnamed officials in the form of being given insufficient meals, and it is apparent that the OSI investigation initiated by Plaintiff's complaints was ongoing for at least some period beyond the

initial February 18, 2019 search, the record is otherwise silent as to why this alleged retaliation would have come two months later.  It is thus questionable whether temporal proximity would give rise to a reasonable inference of causation here.  *Compare, e.g.*, *Rucano v. Annucci*, No. 18-CV-218, 2021 WL 3293504, at *21 (N.D.N.Y. May 19, 2021) (no "strong showing" of temporal proximity where more than two months passed between grievance and alleged retaliatory conduct), *with Richard v. Dignean*, No. 11-CV-6013, 2023 WL 2480585, at *9 (W.D.N.Y. Mar. 13, 2023) ("Plaintiff's filing of grievances between one to three months prior to the filing of the alleged retaliatory disciplinary reports . . . is sufficient to support an inference of retaliation for purposes of summary judgment."), *and Zimmerman v. Racette*, No. 17-CV-375, 2020 WL 3038275, at *20 (N.D.N.Y. Jan. 24, 2020) (characterizing two months between grievance and alleged retaliatory false misbehavior report as "close temporal proximity").  Any officer who intended to plant evidence on Plaintiff in order to retaliate certainly had many earlier opportunities to do so.

In any case, temporal proximity alone would be insufficient to establish a causal connection, *Washington*, 681 F. App'x at 46, and here there is a lack of evidence that Milisauskas even knew about Plaintiff's allegations against Jacobs.  The record reflects that Milisauskas knew that contraband had been recovered from Plaintiff on February 20, 2019, while Plaintiff was at CRMC, (ECF No. 87-1 at 040), but there is no evidence that Milisauskas was aware of the February 18, 2019 search, let alone that Plaintiff complained about it.  Conclusory allegations of retaliation by one officer for a complaint made against a different officer, where there is no evidence the allegedly retaliating officer even knew of the complaint, are insufficient to give rise to an inference of causation.  *See Vasquez v. Rockland County*, No. 15-CV-8912, 2017 WL 456473, at *5 (S.D.N.Y. Feb. 1, 2017) (collecting cases).  Even if the Court can infer

that Milisauskas may have had at least some awareness of the February 18 search and Plaintiff's complaints, that alone does not establish that Milisauskas had a motive to retaliate in this manner. *See Roseboro*, 791 F. Supp. 2d at 369 ("[E]ven assuming that Counselor Wingate knew about [plaintiff's] grievance against Officer Gillespie, [plaintiff] has failed to provide any basis to believe that Counselor Wingate retaliated for a grievance that she was not personally named in.") (collecting cases); *Hare v. Hayden*, No. 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009)). Absent some other evidence of retaliatory intent, such as a statement or threat by Milisauskas that might demonstrate such intent,[22] the mere fact that Milisauskas and Jacobs may work together is insufficient to raise a legitimate inference that Milisauskas was retaliating for a complaint made against Jacobs. *See Roseboro*, 791 F. Supp. 2d at 369 n.23.

The remaining factors do not alter this conclusion. The evidence with regard to Plaintiff's prior behavior is limited, as neither side has provided Plaintiff's disciplinary history (or lack thereof). But the facts of this case and Plaintiff's admissions make clear that Plaintiff had at least once, recently, smuggled a significant amount of contraband into the prison. And Plaintiff testified he had been issued at least one prior misbehavior report for possession of contraband, (P's Depo. at 8:16-9:11), though he denied having a pattern of bringing drugs into prisons, (*id.* at 85:2-13). And Plaintiff implicated himself in the possession of contraband on

---

[22] Although Plaintiff claims Jacobs told him he had "buddies" in the SHU who might retaliate, (P's Depo. at 55:17-56:3), and Milisauskas worked in the SHU, Jacobs' statement is hearsay as to Milisauskas and not admissible against him. Even if it were, there is no evidence that Milisauskas was one of those "buddies," despite the fact that Jacobs may also have worked in SHU. (*Id.* at 50:6-10.)

April 16, 2019; whether that was false, as Plaintiff claims, or true, it is not good behavior. Based on the limited record before me, this factor favors Defendants.

Finally, the parties dispute whether Plaintiff was vindicated at a later disciplinary proceeding. Milisauskas asserts in his affidavit that Plaintiff was found guilty of the charges, (Milisauskas Decl. ¶ 7), and Plaintiff states that the charges against him were "outright dismissed," (P's Depo. at 64:20-65:2; *see* P's Aff. ¶ 3). Neither supports their assertion with evidence of Plaintiff's prison disciplinary record. There is thus a question of fact whether Plaintiff was vindicated at a later proceeding.

Nonetheless, taken together the circumstances here are simply insufficient to demonstrate the requisite causal connection between Plaintiff's protected conduct and the alleged retaliation. While there remains some question of fact regarding whether or not Plaintiff was vindicated at the later proceeding, in light of the other factors – particularly the fact that Milisauskas was not involved in the February 18 search and may not have even known about it, and the lack of evidence that he knew a complaint against Jacobs had resulted – that unanswered factual issue is not material to the outcome here, particularly in light of the skepticism and care with which prisoner retaliation claims are to be evaluated. As such, Defendants' motion is granted with regard to the claim against Milisauskas.

### 2.    Jacobs

Plaintiff alleged in his deposition that Jacobs verbally threatened him in retaliation for his complaints regarding the February 18, 2019 search. But "verbal harassment, standing alone, does not amount to a constitutional deprivation." *Cole v. Fischer*, 379 F. App'x 40, 43 (2d Cir. 2010) (summary order).

Plaintiff also states in his affidavit (but did not testify at his deposition),[23] that on April

17 or 18, while he was at CRMC, Jacobs "came into my room and put his hands around my neck

and tell [sic] me I better change my story" regarding the February 18 search.  (P's Aff. ¶ 2.)

"[P]hysical assault may, depending on its severity, constitute an adverse action for purposes of

a First Amendment retaliation claim."  *George v. Cnty. of Westchester*, No. 20-CV-1723, 2021

WL 4392485, at *8 (S.D.N.Y. Sept. 24, 2021).  "Indeed, the alleged assault need not rise to the

level of an Eighth Amendment excessive force violation in order to be considered an adverse

action for purposes of First Amendment retaliation analysis."  *Flemming v. King*, No. 14-CV-

316, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016), *report and recommendation adopted,*

2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016).  "Instead, the Second Circuit has stated that the

---

[23] "Under the sham-affidavit doctrine, a party may not create an issue of fact by
submitting an affidavit in opposition to a summary judgment motion that, by omission or
addition, contradicts the affiant's previous deposition testimony."  *Wang v. Leo Chuliya, Ltd*, No.
20-CV-10395, 2024 WL 324789, at *3 (S.D.N.Y. Jan. 29, 2024).  "If a party who has been
examined at length on deposition could raise an issue of fact simply by submitting an affidavit
contradicting his own prior testimony, this would greatly diminish the utility of summary
judgment as a procedure for screening out sham issues of fact."  *Brown v. Reinauer Transp.
Cos., L.P.*, 788 F. App'x 47, 49 (2d Cir. 2019) (summary order).  "Courts in the Second Circuit
are particularly reluctant to credit affidavit testimony that alleges critical, obviously material
facts that were not mentioned at deposition."  *Wang*, 2024 WL 324789, at *3.  "However, this
rule does not apply in two situations:  (1) where the subsequent sworn statement either does not
actually contradict the affiant's prior testimony or addresses an issue that was not, or was not
thoroughly, explored in the deposition; and (2) where the deposition testimony at issue is
contradicted by evidence other than the deponent's subsequent affidavit."  *Fed. Deposit Ins.
Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 94-95 (S.D.N.Y. 2020).

Here, Plaintiff made no mention in his deposition of the incident with Jacobs at CRMC,
even though he talked about other retaliation from Jacobs, including an incident where Jacobs
allegedly got him alone to threaten him, (*see* P's Depo. at 55:2-56:3), and discussed other aspects
of his April hospital stay, during which he alleges this incident occurred, (*id.* at 62:13-63:4.)  But
Plaintiff was not specifically asked about this incident at his deposition, even though he included
an allegation about it in his unsworn Amended Complaint.  (*See* AC at 8-9.)  The incident thus
"was not, or was not thoroughly, explored in the deposition," *Fed. Deposit Ins. Corp.*, 500 F.
Supp. 3d at 95, and the sham affidavit rule does not apply.  In any event, Defendants did not
raise the sham affidavit rule in their reply brief.

issue of whether the alleged retaliation has reached the threshold of actionability under Section 1983 is factual in nature." *Zielinski v. Annucci*, 547 F. Supp. 3d 227, 234 (N.D.N.Y. 2021).

Here, the only evidence of the alleged altercation between Plaintiff and Jacobs is Plaintiff's threadbare statement in his affidavit that Jacobs "came into my room and put his hands around my neck and tell [sic] me I better change my story" regarding the February 18 search.[24] (P's Aff. ¶ 2.) Plaintiff presents no evidence regarding the severity of Jacob's contact or any injuries that resulted. Construed in the light most favorable to him, Plaintiff's claim is not sufficiently severe to rise to the level of an "adverse action." *See George*, 2021 WL 4392485, at *7-8 (finding allegations that defendant "retaliated against Plaintiff in response to the Second Grievance by entering his cell, shoving him against a wall, demanding that Plaintiff retract the contents of the Second Grievance" insufficient to plead adverse action and collecting cases); *Zielinski*, 547 F. Supp. 3d at 234 (concluding on summary judgment that plaintiff's claim that defendant "entered his cell and shoved him backward by the throat, causing no injuries," is insufficient to establish adverse action); *Woodward v. Afify*, No. 14-CV-856, 2018 WL 9875253, at *11 (W.D.N.Y. Sept. 28, 2018) (concluding on summary judgment that "a single punch" is an insufficient adverse action and collecting cases), *report and recommendation adopted,* 2019 WL 5394217 (W.D.N.Y. Oct. 22, 2019). Accordingly, Defendants' motion is granted with regard to the retaliation claim against Jacobs.

---

[24] Jacobs states that he never interacted with Plaintiff at CRMC, (Jacobs Decl. ¶ 16), and Defendants have produced a logbook with entries every fifteen minutes covering the duration of Plaintiff's hospital stay, (*see* ECF No. 87-2 at 108-15), as well as a video purportedly depicting an area of the hospital apparently outside of Plaintiff's room on April 18, 2019. The CRMC records of his stay there in April include no report of any such incident, (*see* ECF No. 87-8), despite Plaintiff's allegation in his Amended Complaint that he was screaming for help.

### 3.    "John Doe" Retaliation Claims

Plaintiff alleges that unnamed prison officials were failing to give him food or giving him less than a full portion in retaliation for his complaints related to the February 18, 2019 search. (AC at 11.)  While this would constitute an adverse action in connection with the exercise of a protected right, absent any additional factual detail there is simply no basis upon which a reasonable jury could infer a causal connection between any alleged issues with Plaintiff's food and his protected conduct.  And, in any event, now that discovery has concluded, Plaintiff's failure to identify the John Does means that any claims against them must be dismissed.  *See Gayot v. Maldonado*, No. 14-CV-4339, 2024 WL 5239203, at *7 (E.D.N.Y. Dec. 28, 2024) (dismissing claims against "John Does" where plaintiff failed to identify individuals after discovery); *Jeanty v. Cnty. of Orange*, 379 F. Supp. 2d 533, 536 n.3 (S.D.N.Y. 2005) (same).

### 4.    Supervisory Claims Against Keyser

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Colon*, 58 F.3d at 873.  While *Colon* laid out a special test for supervisory liability outlining five ways a plaintiff could show personal involvement of a supervisor, the Second Circuit has clarified that under the Supreme Court's ruling in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the *Colon* test is invalid and "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).  Merely being in the chain of command is not enough to satisfy this standard.  *See id.*  While "'[t]he factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue' because the

elements of different constitutional violations vary," *id.* (quoting *Iqbal*, 556 U.S. at 676), "[t]he violation must be established against the supervisory official *directly*," *id.* (emphasis added).

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 833). To prevail on a claim that officials have failed to protect an inmate from harm, a plaintiff must demonstrate that, objectively, the conditions of his incarceration posed a substantial risk of serious harm and, subjectively, that the defendant acted with deliberate indifference. *See Farmer*, 511 U.S. at 834; *Hayes*, 84 F.3d at 620. "[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes*, 84 F.3d at 620. A plaintiff must show that a prison official actually knew of, but disregarded, an excessive risk to his safety: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see Tangreti*, 983 F.3d at 619.

Plaintiff alleges a failure-to-protect claim against Superintendent William Keyser with regard to the alleged retaliation in April by Milisauskas and Jacobs, (AC at 9), but he has not provided evidence of, or even alleged, any facts that could give rise to a constitutional claim. Plaintiff's only testimony regarding Keyser's involvement is a claim that Keyser "put a piece of paper under [Plaintiff's] door" sometime in April indicating that OSI was going to call Plaintiff regarding his claims, (P's Depo. at 66:6-12), and then came back a few days later and told Plaintiff that after he finished his time in SHU Keyser was "going to see [about] getting

[Plaintiff] back to Sullivan," (*id.* at 66:19-24).[25]  Even if credited, these allegations do not give

rise to a constitutional claim.  Rather, it appears that Keyser was responding reasonably and

allowing OSI to investigate.[26]  No facts are alleged from which a reasonable jury could conclude

that Keyser acted with deliberate indifference to any known risk; rather, accepting Plaintiff's

allegations as true, it is apparent that Keyser was allowing the investigation into Plaintiff's

claims to take its course.  There are no facts in the record from which I could infer that Keyser

knew of a specific risk to Plaintiff from which he failed to protect him.  Accordingly,

Defendants' motion for summary judgement as to Keyser is granted.[27]

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 85), enter

judgment for Defendants, and close the case.

---

[25] This latter claim is confusing because the Court understands from Plaintiff's testimony and from Defendants' submissions that Plaintiff was held at Sullivan during all events related to this lawsuit.  It is possible that Plaintiff misspoke, or meant that Keyser told him he would be returned to general population, or is confusing Keyser with the superintendent of a facility to which he was later transferred.

[26] OSI, according to Plaintiff, ultimately found his complaints unsubstantiated.  (P's Depo. 67:9-68:20.)

[27] Plaintiff also alleges in his affidavit, although not in his Amended Complaint, that Keyser failed to protect him by ignoring his letters complaining about prison officers not feeding him and by allowing Jacobs to work in the SHU "knowing that [Jacobs] had sexually assaulted [him]."  (P's Aff. ¶ 5.)  "A plaintiff, even when proceeding *pro se*, may not raise new allegations for the first time in opposition to summary judgment." *Pierre v. City of N.Y.*, 531 F. Supp. 3d 620, 628 n.5 (E.D.N.Y. 2021); *see Espinoza v. N.Y.C. Dep't of Transp.*, 304 F. Supp. 3d 374, 378 n.1 (S.D.N.Y. 2018).  Accordingly, the Court declines to consider those allegations.

**SO ORDERED.**

Dated: February 28, 2025
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.